**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**ALGERNON BLAIR, INC., Defendant-**
**Appellant.**

**No. 29979.**

United States Court of Appeals,
Fifth Circuit.

May 6, 1971.

John R. Matthews, Jr., Montgomery, Ala., for defendant-appellant.

Ira DeMent, U. S. Atty., F. E. Leonard, Jr., Asst. U. S. Atty., Montgomery, Ala., Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Charles E. Anderson, Attys., Dept. of Justice, Tax Div., Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, COLEMAN, and CLARK, Circuit Judges.

COLEMAN, Circuit Judge:

The District Court granted summary judgment against Algernon Blair, Inc. for income tax and FICA withholding tax in the amount of $49,375.66 plus interest, § 3505(b) of the Internal Revenue Code of 1954 (as effective January 1, 1967).[1]

Blair initially moved to dismiss the Government's complaint on the ground that § 3505(b) is unconstitutional. Upon the denial of this motion the Government took depositions and moved for a summary judgment, which was granted. We affirm.

Blair was the prime contractor on two projects, one in Montgomery, Alabama, and one in Fort Jackson, South Carolina. Whitehead Plumbing and Heating, Inc. had the plumbing sub-contract on both jobs. Early in 1968, Whitehead ran into financial difficulties. On January 18, 1968, Blair and Whitehead entered into an agreement whereby Whitehead granted Blair a security interest in certain of its property to secure advances which Blair was to make and did make to Whitehead to enable the latter to pay its wages and suppliers in completing both contracts.

The Court below specifically found that Blair knew the advances it was making to Whitehead were for the payment of wages and, furthermore, that Blair had actual notice and knowledge that Whitehead could not make timely payments of taxes which were due to be withheld.

The Court's findings were based on substantial and undisputed evidence. Mr. Whitehead, the sub-contractor's president, went to the officials of Blair and told them he just "couldn't go any further" and that he couldn't handle the monetary requirements for the work he was performing as sub-contractor. Pursuant to this conversation Blair changed the method of paying Whitehead, and a security instrument was drafted by Blair which stated:

"WHEREAS, Whitehead has performed a portion of said sub-contract and *has exhausted its funds and can obtain no financing by which it can meet its payrolls* and pay for the various materials needed to complete said sub-contract, * * *" (Emphasis supplied).

For every payroll period thereafter, Whitehead would supply Blair with a request for funds which specifically recited that Whitehead did not have available funds to meet wages. Checks drawn by Whitehead were furnished to Blair on a daily basis. Blair was told a number of times during 1968 *that Whitehead was not paying the taxes due,* and this information was furnished Blair by Internal Revenue Service agents as early as March 4, 1968.

---

1. Section 3505(b). Personal liability where funds are supplied.—

If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, *with actual notice or knowledge* (within the meaning of section 6323(i)(1) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose.

Blair complains on appeal that the lower court erred in granting summary judgment because Blair had no notice or knowledge that Whitehead would not pay its taxes. Blair also again urges that § 3505(b) of the Internal Revenue Code of 1954 is unconstitutional.

■ The uncontested facts clearly established that when Blair advanced Whitehead its net payrolls only, making no provision for withholding and FICA taxes, it had actual notice or knowledge that Whitehead could not and would not pay these taxes. It thus had notice within the meaning of § 6323(i) (1) of the Internal Revenue Code of 1954.[2]

We simply have here a situation which Congress intended to eliminate when it enacted § 3505(b). The purposes of that legislation are to be found in S.Rep.No. 1708, 89th Cong., 2d Sess., pp. 21–23 (1966—2 Cum.Bull. 876, 891–892), U.S.Code Cong. & Admin. News 1966, p. 3744:

"(b) Liability where a lender, etc., supplies funds to an employer for the purpose of paying wages.—

"The bill provides that if two conditions exist, a lender, etc., is to be personally liable for any unpaid withholding taxes even though he does not himself directly pay the wages of employees of the employer (the borrower). First, for this to be true, the lender, etc., must know that the funds he advances are to be used specifically for the payment of wages. * * * Second, for this provision to apply, the supplier of the funds must have actual notice or knowledge that the employer does not intend to, or will not be able to, make timely payment or deposit of the withholding taxes. * * * *"

Prior to the effective date of § 3505(b), problems arose with the con-

struction industry's device known as "net payroll financing". Using this method, a subcontractor-employer who had financially overextended himself would go to a lender, in this case the prime contractor, for financial assistance. The prime contractor-lender, desirous of having the sub-contractor complete the work, but also wanting to minimize costs would provide only the net payroll funds. In many of these situations, the United States would never receive the withholding taxes due, even though the employees received credit on the records of the Treasury Department as if the taxes had been paid. While the sub-contractor-employer would still be liable for the taxes under §§ 3102(b) and 3404 of the Code, recourse against the employer was often fruitless, as he was financially unable to pay the taxes.

In the exercise of its Constitutional power to levy and provide for the collection of taxes, Congress clearly had the power to counter this loss of taxes with appropriate legislation, U. S. Constitution, Art. 1, Section 8, Cl. 1; Amendment XVI. The statute requires notice. Blair had notice. Blair chose to disregard the notice and the statute.

■ A prime contractor is not compelled to make payroll advances to a financially strapped sub-contractor. If it chooses, however, to do so, with notice of the situation, we can perceive no Constitutional infirmity in Congress requiring that the lender shall not adopt a method which defeats the collection of the taxes due on that payroll. Indeed, to hold otherwise would be to fly in the face of the specific language of the Constitution.

At oral argument counsel for Blair raised the point that in any event Blair should not have been liable for the unpaid taxes accrued in the period preced-

---

2. Section 6323(i) (1). Actual notice or knowledge.—
   For purposes of this subchapter, an organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transaction, and in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence. * *

ing March 4, 1968, the day notice was given Blair by agents of the Internal Revenue Service. However, the security agreement whereby Blair agreed to make the payments incurring tax liability under § 3505(b) was entered into by Blair January 18, 1968, and it reflected the requisite knowledge. The Government's complaint seeks taxes on funds advanced during the period beginning February 6, 1968 and ending December 22, 1968. This argument, therefore, must fail.

The judgment of the District Court is Affirmed.