**UNITED STATES of America, Plaintiff-Appellant-Cross Appellee,**

v.

**PARK CITIES BANK & TRUST COMPANY, Defendant-Appellee-Cross Appellant.**

**No. 72–2887.**

United States Court of Appeals,
Fifth Circuit.

June 15, 1973.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Dennis M. Donohue, Attys., Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Jack M. Kinnebrew, Wilson W. Herndon, Dallas, Tex., for defendant-appellee.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

AINSWORTH, Circuit Judge:

The United States sued Park Cities Bank and Trust Company under 26 U.S.C. § 3505(b) (1971) [1] to recover

---

1. Section 3505(b) reads as follows:
   "If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of

paying wages of the employees of such employer, with actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does

$17,099.74 withholding tax owed to the Government by one of the bank's customers, Newby-Fitch and Associates, Inc., for the first three quarters of 1968. The district court granted judgment in favor of the Government for $11,427.75 attributable to the second quarter and $1,324.85 attributable to the third quarter, but failed to award recovery for $4,-347.14 attributable to the first quarter. The Government appeals insofar as the district court failed to grant judgment for the first quarter, the Government contending that the salient facts were the same for all three quarters. Taxpayer cross-appeals the judgment relative to the second quarter, contending that the Government's recovery should be limited to $4,055.61 instead of $11,427.75 actually awarded. We agree with the Government's contention and reverse insofar as the judgment failed to grant recovery for the first quarter and affirm the stated recovery for the second and third quarters.

Newby-Fitch was required to withhold federal income tax from wages paid its employees and to pay such withheld amounts to the Government. *See* 26 U.S.C. §§ 3402(a), 3403 (1971). Each employee receives a tax credit for the amount withheld from his wages. *See* 26 U.S.C. § 31(a) (1971). In this case Newby-Fitch withheld the tax but was financially unable to pay over to the Federal Government $4,347.14 for the first quarter of 1968, $11,427.75 for the second quarter, and $1,324.85 for the third quarter.[2]

The statute involved, section 3505(b), was passed by Congress to discourage banks from loaning employers enough money to pay employees' "net wages" but not enough to pay the withholding tax due on wages. *See* S.Rep.No.1708, 89th Cong., 2d Sess. (1966), 1966–2 Cum.Bull. 876, 891. To hold the bank liable, two essential conditions must exist. First, the bank must supply funds for the specific purpose of paying wages. Second, the bank must have actual notice or knowledge that the employer will not be able to make timely payment of the withholding tax to the Government. *See generally* United States v. Algernon Blair, Inc., 5 Cir., 1971, 441 F.2d 1379, 1381 (1971). The liability of the bank is limited to an amount equal to 25 per cent of the funds supplied for the purpose of paying wages.

The evidence is clear that the Government has met the first condition. Newby-Fitch maintained two accounts at the Park Cities Bank, one a payroll account entitled in the bank records "Newby-Fitch & Associates, Inc. Payroll Acct" and the other a general account entitled "Newby-Fitch & Associates, Inc." As early as January, and during each of the first three quarters in 1968, checks drawn on the payroll account frequently exceeded the balance in the account; however, the bank paid most of the overdrafts. Deposits from the general account were made in the payroll account, but such deposits sometimes resulted in overdrafts on the general account which the bank honored. Additionally, the bank made loans to Newby-Fitch, and part of the amounts loaned were deposited in the payroll account. The bank's payment of overdrafts and grant of loans for the benefit of the payroll account was clear evidence that the bank supplied funds for the specific purpose of paying employees' wages within the meaning of section 3505(b).

not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose."

2. There was an involuntary petition in bankruptcy filed against Newby-Fitch on August 2, 1968.

In each quarter the amount of funds supplied was more than four times the overdue taxes sought to be collected by the Government. Therefore, the only remaining issue concerns the second condition relative to actual notice or knowledge of the bank.

Section 3505(b) provides that the bank, at the time the funds were supplied, must have had "actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages." According to section 6323(i)(1), 26 U.S.C. § 6323(i)(1) (1971),[3] the bank is deemed to have "actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transaction." *See generally* United States v. Estate of Swan, 5 Cir., 1971, 441 F.2d 1082, 1087.

Here the loan officer in charge of the Newby-Fitch accounts from the beginning of the year through early June was Harold W. Lehrman, a vice president of the bank. He initialed his approval on overdrafts and also granted the loans. His working relationship with the management of Newby-Fitch gave him personal knowledge of the company's financial status. On January 29, 1968, he wrote a letter on behalf of Park Cities Bank requesting the Small Business Administration to purchase 75 per cent of a proposed bank loan of $150,000 to Newby-Fitch. After reviewing the request the SBA refused to participate for reasons expressed in a letter to Lehrman dated February 19, 1968, which pertained to what was stated to be Newby-Fitch's disproportionate debts to net worth, consistent operating losses despite increased sales, inadequate working capital even after the loan, and insufficient collateral to secure the loan. Lehrman did not bring this SBA letter to the attention of other bank officials.

Moreover, he suppressed other facts about the company. For example, the bank had a Loan and Discount Committee composed of one bank employee and eight independent businessmen who reviewed loans in excess of $2,500 and all overdrafts paid by the bank. Lehrman granted loans to Newby-Fitch in excess of $2,500 without obtaining the committee's approval, and struck from a list of overdrafts several Newby-Fitch overdrafts which were not paid in full by the company. In Weekly Maturity Reports submitted to the committee showing amounts outstanding, Lehrman altered the March 31, 1968 Report to show Newby-Fitch owing about $43,000 instead of the correct amount of $53,000, and altered the June 17, 1968 Report to show $69,000 outstanding instead of the actual amount of $109,000.

In June, Lehrman was relieved of his duties for engaging in such irregularities. Even after his departure, the bank continued to approve overdrafts and grant loans to Newby-Fitch.

The district court made a factual determination that Lehrman understood the financial condition of Newby-Fitch well enough to know the company would not be able to pay the amount of tax required to be paid on June 30, 1968, and that other executive officers knew New-

3. Section 6323(i)(1) reads as follows:
"For purposes of this subchapter, an organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transaction, and in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routine. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information."

by-Fitch would not be able to pay the tax due September 30, 1968. The district court made no finding with regard to Lehrman's knowledge about Newby-Fitch's ability to pay the tax due for the first quarter on March 31, 1968, but we consider the evidence overwhelming that Lehrman also knew that Newby-Fitch would be unable to pay the tax due on March 31, 1968.

The bank contends, however, that Lehrman's knowledge of the company's inability to pay should not be imputed to it because of the well-known agency rule that the principal is not charged with knowledge of his agent where the agent deals for himself or where he is more intent on furthering the interests of a third party than that of his principal.[4] Park Cities Bank argues that this rule is applicable by virtue of the legislative history of section 6323(i)(1).[5] Internal Revenue Code section 6323(i) (1) is clear in expressing the rule that knowledge by the individual conducting a transaction is deemed to be knowledge by the organization, so we need not resort to the legislative history for further guidance.[6]

Since the bank knew through Lehrman that Newby-Fitch would not be able to make timely payments of the withholding tax to the Government, it is liable for the amounts due in all three quarters.

Newby-Fitch has cross-appealed on the theory that the bank did not have notice of Newby-Fitch's financial condition until June when Lehrman's employment was terminated, and that only the funds supplied after his departure should be considered for purposes of the 25 per cent limitation in section 3505(b). However, we have already concluded that Lehrman's knowledge is imputed to the bank, and thus, funds supplied by the bank in all three months of the second quarter were properly considered by the district court.

We, therefore, affirm the district court's holding in favor of the Government for the second and third quarters of 1968, and reverse insofar as the district court failed to award judgment for the Government as to the first quarter.

Reversed in part, affirmed in part.

4. See 3 C.J.S. Agency § 269, pps. 202, 203. Even if this rule applied, we do not believe that the facts show that Lehrman acted adversely to the bank's interests. Quite the contrary, he appears to have undertaken to preserve the Newby-Fitch loans because he believed that with more time the company could repay Park Cities Bank in full. There is no evidence that he was motivated by personal gain, or that he had any interest in Newby-Fitch beyond that of a customer of the bank. Furthermore, the district court decided that his knowledge should be imputed to the bank under the exception to the adverse interest rule, that is, that an adverse agent's knowledge is imputed to his principal if the agent was the sole representative in the transaction.

5. The relevant Senate Report No. 1708, 89th Cong., 2d Sess. (1966), 1966-2 Cum. Bull. 876, 885, indicates that Congress adopted the Uniform Commercial Code concept of "actual notice or knowledge"

expressed in UCC 1-201(27). With Congress's adoption of the concept in UCC 1-201(27), the bank contends that Congress adopted also the general rules of agency expressed in UCC 1-103, entitled "Supplementary General Principles of Law Applicable," which reads in pertinent part as follows: "Unless displaced by the particular provisions of this Act, the principles of law and equity, . . . principal and agent, . . . shall supplement its provisions."

6. Furthermore, the legislative history does not lead to a different result. Congress did no more than track the language of UCC 1-201(27) without adopting any other concept of the Uniform Commercial Code. UCC 1-103 declares that the principles of agency apply only if not "displaced by the particular provisions of this Act." The specific rule of UCC 1-201(27) appears to displace the general principles of agency in the circumstances of this case.