**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**COCONUT GROVE BANK,
Defendant-Appellant.**

No. 75–2411.

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1977.

Robert E. Falb, Washington, D.C., George L. Knight, Miami, Fla., for defendant-appellant.

Robert W. Rust, U.S. Atty., Miami, Fla., Scott P. Crampton, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Gilbert E. Andrews, Act. Chief, Appellate Sec., Elmer J. Kelsey, Daniel F. Ross, George G. Wolf, Attys., Tax Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before BROWN, Chief Judge, and HILL and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The United States brought this suit under Section 3505(b) of the Internal Revenue Code of 1954 ("the Code") to collect from the appellant, Coconut Grove Bank ("the Bank"), $65,421.76 in employment taxes which one of its borrowers, R. D. Monroe Construction Co., Inc. ("Monroe"), collected but failed to pay or deposit on behalf of its employees. The case was tried before a jury, which rendered a special verdict concluding as follows: (1) that the Bank supplied certain funds to Monroe during the period July 11 to December 22, 1970 for the purpose of paying wages on one of Monroe's construction projects; (2) that the Bank had failed to establish procedures for determining whether Monroe intended or was able to pay the employment taxes; (3) that the Bank had notice or knowledge that Monroe was unable to pay its employment taxes; (4) that Monroe was unable to make timely payment or deposit of its employment taxes at the time funds were credited by the Bank to its account. After judgment was entered on the verdict of the jury, the Bank moved to set aside the verdict and judgment and for judgment notwithstanding the verdict. The motion was denied and this appeal follows.

### I. *The Facts.*

In May, 1970, Monroe contracted with Acropolis Construction Corporation

("Acropolis") to perform certain construction work, as a subcontractor, in the erection of a 27 story condominium located in Key Biscayne, Florida and known as Casa del Mar. In June or July, 1970, after Monroe had begun work on the project, Robert D. Monroe, president of the company, informed Miguel Gonzalez, treasurer of Acropolis, that Monroe Construction lacked sufficient working capital to meet the weekly expenses incurred in the course of performing the subcontract with Acropolis. Although Monroe was entitled to monthly progress payments from Acropolis, the firm was required to meet payroll and other expenses on a weekly basis. Gonzalez advised Monroe that Acropolis also received its payments at monthly intervals and, therefore, was unable to accommodate Monroe with interim financing.

At Gonzalez' suggestion, Robert Monroe and Loren E. White, secretary-treasurer of Monroe Construction, met in late June, 1970, with Amaury P. Betancourt, vice-president of the Bank, for the purpose of applying for interim loans on behalf of Monroe Construction. At that meeting, White furnished the Bank with a financial statement of Monroe Construction for the period ended May 31, 1970, and a summary of anticipated costs to complete the subcontract with Acropolis.

The balance sheet furnished by Monroe indicated that the firm was experiencing a severe liquidity problem. Although the statement showed a net worth of $449,-448.49, a substantial portion of the firm's assets consisted of accounts receivable. The statement furnished to the Bank by Monroe also indicated that Monroe had only $5,278.54 in cash available to discharge its current liabilities, which exceeded $1,375,-000. Moreover, the statement disclosed that Monroe had $91,780.20 of "Payroll taxes and accrued expenses." There is no indication in the statement, however, as to how much of this obligation represented accrued employment taxes and how much represented other "accrued expenses." Nonetheless, Mr. White testified on behalf of the company that, in his opinion, the accounts receivable were collectible and, when collected, would permit Monroe to discharge its employment tax liability.

After a meeting between Mr. Betancourt and Monroe's representatives, the Coconut Grove Bank denied Monroe's loan application. By way of explanation, Mr. Betancourt testified that it was the Bank's policy to make loans only to local customers. Monroe Construction also applied for loans to other Dade County banks and its applications were likewise rejected.

Monroe and Gonzalez discussed the difficulty that Monroe Construction was experiencing in arranging for credit in the Miami area. In order to assist Monroe, Gonzalez then approached Coconut Grove Bank on behalf of Monroe and suggested that Acropolis would be willing to guarantee any loans made to its subcontractor for the Casa del Mar project. Betancourt, on behalf of the Bank, agreed to provide short-term loans to Monroe Construction, provided that promissory notes representing the indebtedness were guaranteed and endorsed by Acropolis. The Bank established a procedure whereby it would advance funds to Monroe by depositing funds in an account which Monroe had opened with the Bank. Checks drawn on this account were signed by officers of Monroe, but they were also countersigned by an employee of Acropolis as a precautionary measure to insure that the expenditures were related to the Casa del Mar project. After Monroe's expenditures were verified, Acropolis would, through the action of two officers, guarantee and endorse a promissory note issued by Monroe Construction in the total amount of such expenditures. The note would then be delivered to the Bank, which in turn transferred funds to Monroe's account. Afterwards, Monroe could deliver the checks to the payees thereof.

There was testimony in the record that most, but not all, of the checks drawn on the account of Monroe Construction were used to discharge payroll obligations. From July 17, 1970, through December 22, 1970, the Bank made 25 separate advances to Monroe and, in each case, accepted a note

from Monroe which was guaranteed and endorsed by Acropolis.

While the construction work was being performed, Monroe became entitled to receive progress payments from Acropolis once each month. Acropolis would pay Monroe by satisfying in full Monroe's obligation to the Coconut Grove Bank and remitting the balance to Monroe. In this manner, Acropolis not only discharged in full Monroe's liability to the Bank, it also transferred to Monroe over $270,000 in excess of the amount paid to the Bank. Despite its receipt of these payments, however, Monroe failed to make timely deposit or payment of employment taxes withheld from its employees' wages for the third and fourth calendar quarters of 1970. Consequently, the unpaid taxes relating to the Casa del Mar project amounted to over $65,000.00. Mr. White, Monroe Construction's secretary-treasurer, testified that the employment taxes were not deposited when due because the firm lacked available funds at the due date for deposit.

Sometime in September, October or November of 1970, a representative of the IRS contacted Monroe and arranged a conference to discuss Monroe's failure to pay employment taxes in connection with a quarterly report filed in June of 1970. At this conference the IRS agent reviewed the financial prospects of the corporation, including the anticipated profits on the Casa del Mar project. As a result of the conference, the IRS took no action to collect the delinquent employment taxes owed by Monroe.

Other than possible conclusions which the Bank might have drawn from the financial statement furnished by Monroe in connection with its loan application, the Bank never received any indication that Monroe was unable to pay its employment taxes. Although Gonzalez, on December 24, 1970, received from Monroe a list of the unpaid obligations of Monroe with respect to the Casa del Mar project, the list did not include the unpaid employment taxes withheld from the wages of Monroe's employees working on the project. Furthermore, the record clearly establishes that the Bank made no attempt to ascertain whether Monroe intended or was able to pay employment taxes accrued with respect to the Casa del Mar project.

## II. *Disposition of the Case in District Court.*

Coconut Grove Bank moved for a directed verdict at the close of all the evidence. The motion was denied and, after a conference with counsel, the District Court, over the objection of counsel for the Bank, instructed the jury on the question whether the Bank had actual notice or knowledge that Monroe was unable to make timely deposit or payment of its employment taxes. The dispute in this case centers around the instructions given to the jury by the trial judge, the pertinent portions of which are set forth below:

In order to have exercised due diligence in this case, the Coconut Grove Bank must have established and complied with reasonable routines or procedures in the operation of its business for the communication of information from the R. D. Monroe Construction Co., Inc., or other sources of information, to the official or employee of the Bank conducting the transaction.

The routines and procedures must be sufficient to reasonably establish whether the R. D. Monroe Construction Company, Inc., did not intend to or was not able to make timely deposit or payments of the Federal payroll taxes required to be withheld from the wages of its employees.

In the event that you find that the Coconut Grove Bank did not have reasonable routines and procedures in the operation of its business, for the communication of the information that R. D. Monroe Construction Company, Inc., did not intend to, or was not able to make timely deposit or payments of the weekly payroll taxes required to be withheld from the wages of its employees, then with respect to each such loan transaction the Coconut Grove Bank has not exercised the due diligence required by law.

The Coconut Grove Bank would therefore, *be deemed to have notice or knowledge* that the R. D. Monroe Construction Company, Inc., did not intend to, or was not able to make timely deposit or payments of the weekly payroll taxes required to be withheld from the wages of its employees. (emphasis added).

On the basis of these instructions, the jury answered the following special interrogatories, among others, as indicated:

3. Do you find that the Coconut Grove Bank had established reasonable routines and procedures for communicating significant information from the R. D. Monroe Construction Co., Inc. to the Bank official or employee who conducted the loan transactions with respect to the R. D. Monroe Construction Co., Inc. (Answer yes or no):

Yes _____          No __X__

\*    \*    \*    \*    \*    \*

5. Do you find that the Coconut Grove Bank had notice or knowledge that the R. D. Monroe Construction Co., Inc., did not intend to or would not be able to make timely deposit or payment of the Federal payroll taxes required to be withheld or deducted from the wages of its employees on the Casa del Mar project? (Answer yes or no):

Yes __X__          No _____

In essence, the jury found that, since the Bank had not established routines or procedures for the communication of information from Monroe to the Bank official who conducted the loan transaction, the Bank would be deemed to have the requisite notice or knowledge for a finding of liability under Section 3505(b). Furthermore, as a factual matter, the jury found that Monroe would not be able to make payment or deposit of its employment taxes at the time moneys were credited by the Bank to its account. The jury did not find, however,

that Monroe had any intent not to make timely payment or deposit of its employment taxes and this conclusion is not challenged on appeal.

### III. *Analysis of Arguments on Appeal.*

The Bank's argument is two-fold. It first contends that the District Court erred in instructing the jury that Section 3505(b) required the Bank to establish procedures for determining whether Monroe was able to pay federal employment taxes. The Bank contends that neither the legislative history of Section 3505(b), the proposed regulations under the Section nor any decision construing the Section requires the Bank to determine or otherwise investigate a borrower's ability to pay employment taxes. The Bank next contends that the District Court erred in denying its motion for judgment notwithstanding the verdict because there was no evidence that Monroe was unable to pay its employment taxes.

Section 3505(b) was adopted as section 105 of the Federal Tax Lien Act of 1966 [1] in response to a particular abuse then prevalent in the construction industry. This practice, known as net payroll financing, resulted in tax avoidance when a lender would advance funds to a contractor in an amount sufficient to meet only the contractor's net payroll, not including employment taxes. Generally, if the contractor became insolvent there would be no funds available to pay the firm's employment taxes since the lender had provided no funds for that purpose and since the contractor's employees had been given credit for the deduction of employment taxes from their wages.

Prior to 1966, this Court and the Courts of Appeals of other circuits had held that lenders or sureties could not be made liable for unpaid employment taxes because they were not "employers" responsible for paying the taxes.[2] With the enactment of Sec-

---

1. Federal Tax Lien Act of 1966 § 105, Pub.L. No. 89–719, 80 Stat. 1138 (codified at 26 U.S.C. § 3505(b) (1966).

2. *Phinney v. Southern Warehouse Corp.*, 212 F.2d 488 (5th Cir. 1954); *General Casualty Co.*

*of America v. United States*, 205 F.2d 753 (5th Cir. 1953); *Century Indemnity Co. v. Riddell*, 317 F.2d 681 (9th Cir. 1953); *Westover v. Wil-*

tion 3505(b) in 1966, however, the Congress specifically imposed liability for unpaid employment taxes upon sureties and other lenders who advance funds to an employer, for the purpose of meeting payroll expenses, with actual notice or knowledge that the employer is unable or intends not to pay such taxes:

>(b) *Personal liability where funds are supplied.*—If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 per cent of the amount so supplied to or for the account of such employer for such purpose.

Since the first element of liability—furnishing of funds for the purpose of paying wages—was found by the jury in this case, the critical question is whether the defendant had "actual notice or knowledge," within the meaning of § 6323(i)(1), which provides as follows:

>(1) *Actual notice or knowledge.*—For purposes of this subchapter, an organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transac-

tion, and *in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence.* An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routine. . . . (emphasis added).

### A. *The Due Diligence Requirement of Section 3505(b).*

■ Appellant contends that the trial court erred by instructing the jury that the Bank had a duty, by virtue of the due diligence requirement of Section 6323(i)(1), to seek out or affirmatively determine a borrower's ability to pay employment taxes which would be associated with the loan transaction concerned. Appellant urges that the District Court's interpretation of Section 6323(i)(1) is erroneous in that the Section is intended to limit, rather than expand, what the lender will be deemed to know. Since the wording of the Section is substantially similar to Section 1–201(27) of the Uniform Commercial Code ("UCC"), appellant contends that the section serves the same purpose as its UCC counterpart—to establish when an organization, such as a bank having many divisions, is deemed to have notice or knowledge of a fact known to one of its divisions or employees.[3] It is appellant's position, therefore, that the section does not impose an affirmative duty upon a lender to obtain information from outside its own organization.

The appellant also relies upon the legislative history of Section 3505(b) for the proposition that the Section imposes no affirmative duty upon a lender to determine the ability of a borrower to pay employment taxes. For example, appellant notes that in a report accompanying H.R. 11256, the

---

*liam Simpson Construction Co.,* 209 F.2d 908 (9th Cir. 1954).

**3.** The UCC draftmen's comment states that "[Section 1–201(27)] makes clear that reason to know, knowledge, or a notification, although 'received' for instance by a clerk in Department A of an organization, is effective for a transaction conducted in Department B only from the time when it was or should have been communicated to the individual conducting that transaction."

Treasury Department stated that the section "will not impose upon lenders a general obligation to determine the purpose of every loan *or the ability of the borrower to pay subsequent withholding taxes.*" [4] (emphasis added). The appellant argues further that the legislative history of Section 3505(b) supports its argument that the "due diligence" provision of Section 6323(i)(1) was intended to limit the knowledge which would be attributed to a lender when one of its employees received notice or knowledge of a certain fact. This construction is based on a statement by the former chairman of the American Bar Association Committee on Federal Tax Liens, Laurens Williams, who, in a letter to Chairman Wilbur D. Mills of the House Ways and Means Committee, urged the Committee to define "notice or knowledge," for purposes of Section 3505(b), as those terms are defined in the UCC.[5]

On the other hand, the Government contends that a lender is not entitled to "bury its head in the sand, deny actual knowledge of the nonpayment of taxes and escape liability." The Government, however, has articulated its position in the following manner: "Clearly the 'due diligence' requirement of Section 6323(i)(1) includes a requirement that a bank investigate a situation where the information in the bank's possession would lead a reasonable person to suspect that employment taxes would not or could not be paid." As noted in the appellant's brief, this statement of the Bank's obligation is significantly different from the obligation described to the jury by the District Court.

At the outset, therefore, we wish to point out that the result reached in the District Court was not, as suggested by the Government, predicated upon a duty to investigate information already in the possession of the Bank. Rather, the jury instructions, coupled with the special interrogatories fashioned by the Court, undoubtedly left the jury with the impression that the Bank had a duty to inquire, *outside its own organization*, whether Monroe was able to pay its employment taxes. The jury found a breach of this duty and the Bank's liability was based thereon. As a result, we must limit our review to an examination of the District Court's instructions and interrogatories. The question before us is whether a lender such as the Bank must investigate, outside its own organization, a borrower's ability to pay employment taxes. We need not determine what circumstances might oblige a bank to investigate suspicious information already in its possession.

The only case which appears to support the Government's interpretation of "due diligence" is *United States v. Whilmar General Contractors, Inc.*, 25 A.F.T.R.2d 70–1306 (N.D.Tex.1970), where the court stated as follows: "If Whilmar General Contractors, Inc. had used due diligence to determine whether G & S Masonry Company was able to pay the taxes required to be deducted from the wages of its employees, the officers of Whilmar General Contractors, Inc. would have had knowledge that the taxes would not be paid on time by G & S Masonry Company." Although the statement of the facts in *Whilmar* is rather cryptic, it is clear that the lender there had actual knowledge that the borrower was unable to pay for materials on its construction project and unable to pay the wages of its employees who were working on the project. Thus, the Court's finding of an affirmative duty to investigate the borrower's financial situation appears to be based on facts acquired without investigation.

In the course of evaluating the legal sufficiency of the jury instructions given below, we have located a number of cases in which a lender was found to be liable for employment taxes on the basis of actual knowledge that the borrower intended not to pay or was unable to pay the taxes. *United States v. Park Cities Bank & Trust*

4. Statement by Hon. Stanley S. Surrey, Assistant Secretary of the Treasury, on H.R. 11256 and H.R. 11290, in hearings before the Committee on Ways and Means, House of Representatives, 89th Cong., 2d Sess. at 36, 39 (March 2, 1966).

5. *Id.* at 229.

*Co.*, 481 F.2d 738 (5th Cir. 1973); *United States v. Algernon Blair.*, 441 F.2d 1379, 1381 (5th Cir. 1971); *United States v. Clayton-Kent Builders, Inc.*, 378 F.Supp. 1109, 1114 (M.D.La.1974); *Abrams v. United States*, 333 F.Supp. 1134, 1144, 1148 (S.D.W. Va.1971).

Other than the somewhat ambiguous holding in *Whilmar*, however, we have found no case which suggests that Section 6323(i)(1) imposes an affirmative duty upon a lender to investigate outside its organization to determine a borrower's ability to pay employment taxes. The Government cites *United States v. Estate of Swan*, 411 F.2d 1082 (5th Cir. 1971), in which this court held that a lender had a duty to use due diligence to investigate outside its own organization once it was alerted by "suspicious circumstances," namely the absence of an endorsement by the co-payee of a draft. The value of *Swan* as precedent here is questionable, however, since the District Court's jury instructions in this case would require a bank to undertake outside inquiry even in the absence of suspicious circumstances. Moreover, *Swan* did not involve the collection of employment taxes under Section 3505(b) and, thus, the context of the due diligence requirement was significantly different from the case *sub judice*. Aside from the suggestive but distinguishable decisions in *Whilmar* and *Swan*, therefore, this case presents a question of first impression.

At bottom, there are two competing interpretations at issue here. On the one hand, the interpretation of the appellant comports most closely with the UCC interpretation of Section 1–201(27), after which Section 6323(i)(1) is modeled. On the other hand, the broader interpretation of the Government might better effectuate the purpose of Section 3505(b)—discouraging loans of "net wages" to borrowers who are unable or intend not to pay employment taxes. We conclude, however, that the instructions given to the jury by the District Court, together with the special interrogatories quoted above, imposed a duty on the Bank not found in the statute itself. In

view of the similarity between the two provisions, we believe that Section 6323(i)(1) was intended to serve the same purpose as its UCC counterpart, Section 1–201(27), and no more. The conclusion we now reach is also compelled by the legislative history of Section 3505(b), which indicates the provision was intended to limit, rather than expand, the extent of knowledge deemed to be in possession of a lender. Hence, the District Court's interpretation of Section 6323, as expressed to the jury in its instructions and interrogatories, was erroneous as a matter of law.

**B.  *Denial of Judgment Notwithstanding the Verdict.***

In addition to attacking the interpretation of Section 6323 expressed to the jury below, appellant contends that the District Court erred in denying its motion for judgment notwithstanding the verdict. Appellant contends there was no evidence that Monroe was unable to pay its employment taxes. This contention, of course, raises the question whether the financial statement submitted to the Bank by Monroe, or any other information in the Bank's possession, gave the Bank actual notice that Monroe was unable to pay its employment taxes. Since the underlying question is a factual matter to be determined by a jury upon proper instructions from the court, we remand the issue of actual notice or knowledge to the District Court for resolution in light of our conclusions regarding Section 6323.

**REVERSED and REMANDED.**