**UNITED STATES of America, Plaintiff,**

v.

**METRO CONSTRUCTION COMPANY, INC., Defendant.**

**No. CV 75–2629–EC.**

United States District Court,
C. D. California.

May 31, 1977.

William D. Keller, U. S. Atty. (until 10–18–77) Andrea Ordin, U. S. Atty. (from 10–18–77) Charles H. Magnuson, Chief, Tax Division, J., Clancy Wilson, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff.

D. Earl Ellis, Los Angeles, Cal., for defendant.

## MEMORANDUM AND ORDER FOR JUDGMENT

CRARY, Senior District Judge.

The United States seeks recovery of payroll taxes from the general contractor, defendant Metro Construction Company, Inc., (Metro) on nonpayment of those taxes by Metro's subcontractor, Wanka, the employer.

The issues of law as stated by the parties in their Pre-Trial Conference Order are:

(1) Whether Metro had actual notice or knowledge within the meaning of Title 26, U.S.C. §6323(i)(1), that Wanka did not intend to or would not be able to make timely payment or deposit of the amount of tax required to be deducted and withheld by Wanka (Triple A) for wages paid for the period January 1, 1972, through June 30, 1972.

(2) Whether the funds supplied by the general contractor (Metro) to the subcontractor (Wanka) for progress payments to Wanka constitute funds supplied to or for the account of the employer Wanka for the specific purpose of paying wages of employees of Wanka, 26 U.S.C. § 3505(b), and

(3) Is the action barred by Title 26, U.S.C. § 6501?

Section 6323(i)(1), supra, provides that one is deemed to have notice or know of any fact from the time such fact is brought to the attention of the individual conducting such transaction and, in any event, from the time such fact would have been brought to such individual's attention if the organization had exercised *due diligence*. That Section also states that one exercises due diligence if it maintains reasonable routines for communicating significant information to the one conducting the transaction and there is reasonable compliance with the routine. There is also a provision as to what due diligence does not require.

## DUE DILIGENCE

■ The Court in *United States v. Coconut Grove Bank*, 545 F.2d 502 (5th Cir. 1977), considered the issue of *due diligence*, on the part of one supplying funds under Section 3505(b), supra, in determining whether an employer was able to make monthly payroll deposits or pay the employment taxes.

The Court of Appeals reversed the District Court by reason of a jury instruction which would have required the bank, lender, to take affirmative action to investigate the borrower's (employer) financial ability to pay employment taxes associated with the loan, absent suspicious circumstances.

The defendant bank loaned funds to the subcontractor, Monroe, on the guarantee of payment thereof by the general contractor, Acropolis, this by reason of Monroe's financial inability to carry its payroll or pay its suppliers. Although Monroe received funds from the bank to meet its payroll, it did not make timely deposits or pay the employment taxes it withheld from its employees' wages for the third and fourth quarters of 1970. On December 24, 1970, Acropolis received a list of Monroe's unpaid obligations which did not include payroll taxes but the Court found the defendant bank " * * * never received any indication that Monroe was unable to pay its employment taxes" nor did it make any investigation in that regard.

The Government argued that the *due diligence* requirement of Section 6323(i)(1) made it necessary that the bank investigate a situation where the information in the bank's possession " * * ' * would lead a reasonable person to suspect that employment taxes would not or could not be paid." As noted by the Court, this position was quite different from the obligation described to the jury by the District Court. The Court of Appeals did not decide the issue as to suspicious circumstances, observing:

> "The question before us is whether a lender such as the Bank must investigate, outside its own organization, a borrower's ability to pay employment taxes. We need not determine what circumstances might oblige a bank to investigate suspicious information already in its possession." Page 507

The Court of Appeals in the *Coconut Grove* case cited and discussed *United States v. Whilmar General Contractors, Inc.*, 25 A.F.T.R.2d 70–1306 (N.D.Tex.1970), and *United States v. Estate of Swan*, 441 F.2d 1082 (5th Cir. 1971). In the latter case, the Court held " * * * a lender had a duty to use due diligence to investigate outside its own organization once it was alerted by 'suspicious circumstances,' namely the absence of an endorsement by the co-payee of a draft." Page 508. The Court in the *Swan* case concurred in the ruling of the trial Court that the Union Bank teller " * * * did not exercise due diligence in accepting the draft for deposit without inquiry into the lack of an endorsement by the co-payee Zola Blicker, and that by virtue of 26 U.S.C. § 6323(i)(1) Union Bank must be deemed for purposes of the transaction to have had actual notice or knowledge of the Government's lien." Page 1087.

This Court concludes that, if Metro, in the instant case, had information constituting "suspicious circumstances" which would lead a reasonable person to suspect that employment taxes could not or would not be paid by Wanka, due diligence would require an investigation of the situation by Metro.

## 2ND QUARTER PAYROLL TAXES

Considering the nonpayment of payroll taxes for the second quarter of 1972, the Court concludes that the evidence, including statements of Wanka's former accountant, Mr. Green, both oral and written, and the testimony of Mrs. Wriglesworth, a former Metro secretary, and of Mr. Blankmeyer, handling Metro's Salinas and Sacramento jobs, much of which was corroborated by James, Robert and Lillian Zetz, clearly establishes that Metro knew it had advanced funds to Wanka as labor or payroll draws to cover only Wanka's net payroll. Metro had actual knowledge that the funds it supplied to Wanka as labor draws were for the specific purpose of paying wages of Wanka's employees, that Wanka had made no monthly deposits of employment taxes and did not intend to make timely deposits of or pay employment taxes, and that Wanka was not financially able to make such deposits of or pay said taxes. The Court further concludes that Metro violated the provisions of Sections 6323(i)(1) and 3505(b), supra, and is therefore liable for the second quarter employment taxes.

## 1ST QUARTER PAYROLL TAXES

The facts and circumstances surrounding the question of Metro's liability as to the employment taxes for the first quarter of 1972 are not entirely clear. It appears from the evidence and admitted facts that in December, 1971, Metro asked James Zetz, as a subcontractor, for a bid on Metro's Hartnell Plaza job in Salinas, California. A subcontract was negotiated and Zetz, who had been doing business as Triple A Estimating, executed the contract as Wanka Construction Company, Inc. (Wanka), this by reason of the fact Zetz did not have a contractor's license and was to operate under Wanka's license. Under the subcontract Wanka was to do concrete and framing work.

During the negotiations for the contract it was disclosed by Zetz that he had no funds and that he would have to have advances for payroll and supplies. This was

arranged for by providing in the contract for bimonthly labor draws to be used to meet Wanka's payroll and the issuing of joint checks by Metro to Wanka and the various suppliers furnishing materials and equipment. Mr. Jacobson, the head of Metro, had to approve the subcontract because of the unusual provision as to the bimonthly draws to allow Wanka to meet its payroll. He stated, by deposition, that Zetz had told him that labor draws would be necessary on a twice monthly basis "in order to keep their cash flow." Jacobson also knew that concrete and framing contractors have a reputation for being undercapitalized.

The payrolls, in a lump sum, would be called in by Green to Blankmeyer, or someone in his office in Santa Clara. The number of Wanka's men on the job as carpenters and concrete workers and the hours they work would be checked by Mr. Buckles, Metro's job superintendent on the Salinas project, for Blankmeyer's information in determining the propriety of the amount or draw requested. Green testified that each time he called in the amount needed for the labor payroll he told the Metro representative receiving the call of the urgency to get the money for the payroll to Wanka promptly and that Wanka could not get any credit. On a number of occasions someone from Wanka would go to Los Angeles to get the payroll check from Metro rather than wait for it to be sent to Metro's Santa Clara office because Wanka was a week behind in paying its men. Green stated further that Wanka had no funds but the labor draws with which to pay their men and that in calling in the amount of the labor draw he always gave Metro the amount of the *net* payroll. Green testified that the *net* payroll was about one-third of the *gross payroll costs* and that the *net* payroll was about two-thirds of the *gross payroll*. The parties agree that the standard rule for estimating gross payroll *costs* at the time was to multiply the man days of skilled laborers by $100 a day and the unskilled by $75 per day. This was the method followed by Blankmeyer in determining whether the amount of the labor draw requested was excessive. His work sheets for March 28, 1972, show that by this method he computed the gross payroll costs to be $17,150.00 for the period March 10th to 27th, and that Green's request for the payroll draw for that period was $6,770.00. This fact alone, the Court finds, should have put Metro on notice that it was advancing money for only *net payroll* and that money for payroll taxes and other deductible items were not being paid to Wanka by Metro.

The Court further finds that it may be assumed that Blankmeyer had been testing the amount of Wanka's labor draws in the manner noted above from the inception of the Salinas job and that he should have known the amounts requested by Green for the bimonthly draws were for *net* payrolls since Green testified that its draws were always for the *net* payroll and there is no substantial evidence to the contrary. The Court so finds, although Metro points out that a check to Green for one week's work in July, 1972, amounted to 57% of the gross payroll costs computed as above for that week. Although the one-third rule of thumb may not always be accurate, even a difference of approaching 50% between gross payroll costs and net payroll should have been a flag to Blankmeyer that Green was billing for only net pay and that Wanka was not receiving from Metro the payroll taxes, union benefits, and so forth.

Minimal investigation on the part of Metro would have disclosed facts, including the following: (a) That Wanka was not making monthly deposits of payroll taxes during the first quarter and that payroll taxes were not paid for that quarter, (b) that Wanka's bimonthly labor or payroll draws were in the amount of the *net* payroll, if Metro did not already know that, (c) that Wanka was late in paying its men, (d) that the bimonthly labor draws did not include the payroll items to be withheld as well as other payroll costs, and (e) that the amount of Wanka's bank account on December 16, 1971, was $552.22. There was a substantial amount of money deposited in Wanka's bank account in the early part of March, 1972, which was not represented by Metro checks, and its source was not satisfactorily

established. These funds were promptly checked out of the account.

The parties admit that in March or April Metro decided that Wanka was not financially dependable and Metro required that Wanka thereafter submit payroll listings showing the names, hours worked and wages of each employee, for subsequent periods of payroll draws.

The Court concludes that Metro advanced funds to Wanka for the specific purpose of meeting its payroll with actual notice or knowledge that Wanka was unable or intended not to pay its payroll taxes within the meaning of Section 6323(i)(1). Even under the "due diligence" of that Section, the Court concludes that, having in mind the very suspicious circumstances referred to above, the actual notice or knowledge of the pertinent facts would have been brought to Metro's attention by minimal investigation, on its part, made during the first quarter of 1972. It does not appear that Metro maintained reasonable routines for communicating significant information to the person conducting the transaction.

There is good reason to believe that Metro knew it was paying draws for use by Wanka in meeting its payrolls and that those draws were for the *net* payroll and that Wanka was not receiving the gross payroll costs or even the gross payroll and, therefore, was not receiving the funds for timely deposit and payment of the payroll taxes. *United States v. Algernon Blair, Inc.*, 441 F.2d 1379 at 1381 (5th Cir. 1971).

 Congress has been strict in its requirements as to the payment of all taxes but particularly with respect to employment taxes. Where a supplier of funds is involved under conditions as found in the instant case such supplier may no longer assume nonliability for such taxes by reason of not being the employer.

When a storm flag appears, such supplier of funds must make a reasonable investigation in the circumstances and if there be a disclosure of facts which would evidence liability of the provider of funds under Sections 6323(i)(1) or 3505(b), it must take the necessary corrective measures to avoid further liability.

The Court further concludes that the Government's action is not barred by Section 6501, Title 26, U.S.C., (limitation of actions), since assessment of the taxes was made for the first quarter in June and for the second quarter in September, 1972.

For the reasons noted above, the Court concludes that the Government has carried its burden of proof in this case and judgment is ordered in its behalf.

Counsel for the Government is requested to prepare, serve and lodge proposed Findings of Fact and Conclusions of Law and Judgment, not later than Monday, June 20, 1977.