UNITED STATES of America,
Appellant,

v.

JERSEY SHORE STATE
BANK, Appellee.

No. 85–5263.

United States Court of Appeals,
Third Circuit.

Argued Nov. 5, 1985.

Decided Jan. 10, 1986.

Rehearing and Rehearing In Banc
Denied Feb. 4, 1986.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Wynette J. Hewett (argued), Farley P. Katz, Attys., Tax Div., Dept. of Justice, Washington, D.C., for appellant; James J. West, U.S. Atty., Harrisburg, Pa., of counsel.

Martin A. Flayhart (argued), Carpenter, Harris & Flayhart, Jersey Shore, Pa., for appellee.

Before SEITZ, WEIS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The United States appeals from an order of the district court granting summary judgment in favor of the defendant, Jersey Shore State Bank ("Jersey Shore" or "the Bank"). This court has jurisdiction over the appeal by virtue of 28 U.S.C. § 1291 (1982).

### I.

The United States brought this action alleging that Jersey Shore was personally liable under I.R.C. § 3505(a) and (b) (1982) for the unpaid federal withholding tax liabilities of Pennmount Industries, Inc. ("Pennmount"). The complaint alleged that from the fourth quarter of 1977 through the first quarter of 1980, Jersey Shore (i) paid wages directly to Pennmount employees and (ii) supplied funds to Pennmount for the specific purpose of paying wages with actual notice and knowledge that Pennmount did not intend to, or would not be able to, make timely payments or deposits of the federal taxes required to be deducted and withheld. The complaint also alleged that the Bank's liability under section 3505(a) totals $76,547.57 plus interest,

and that its liability under section 3505(b) totals $72,069.00 plus interest.

In its answer, Jersey Shore admitted making commercial loans to Pennmount, but denied any liability under section 3505. The Bank also alleged that the complaint failed to state a claim upon which relief could be granted, because the United States did not provide it with timely notice of the assessments against Pennmount, which it asserted were required by I.R.C. § 6303(a) (1982).

The United States moved for partial summary judgment with respect to the first count of its complaint, which involved Jersey Shore's liability under section 3505(a). At the same time, the Bank moved for summary judgment on both counts of the government's complaint, arguing that the government's failure to give it notice of the assessments against Pennmount pursuant to section 6303(a) precluded the United States from bringing suit. In its reply, the United States admitted that Jersey Shore had not been given notice pursuant to section 6303(a), but argued that it was not required to give the Bank such notice and, alternatively, that even assuming that such notice was required, the failure to give it did not bar the United States from bringing suit to collect the Bank's liability under section 3505.[1]

Relying upon the Seventh Circuit's opinion in *United States v. Associates Commercial Corp.*, 721 F.2d 1094 (7th Cir. 1983), the district court held that where a lender is liable under section 3505 for another's withholding taxes, the government is required by section 6303(a) to give notice of the assessment against the employer to the lender within sixty days of the assessment. It concluded that the government's failure to give timely notice to Jersey Shore of the assessments against Pennmount barred the United States from bringing suit. This appeal followed.

### II.

Prior to 1966, only "employers" were liable for income, social security, and rail-

---

1. The United States also argued that Jersey Shore received actual notice of its potential lia-

bility for Pennmount's withholding taxes as early as January of 1979.

road retirement taxes required to be withheld and deducted from employee wages—despite the many situations in which persons other than employers directly or indirectly paid the wages. Problems arose when these third parties paid the employees only "net" wages, neglecting to pay to the government the withholding taxes due. When this occurred, the government was often unable to collect the taxes required to be deducted and withheld, despite the fact that it was required to credit the employees' accounts for them. Recourse against the employer was often fruitless, because it was frequently without any financial resources. And the government could not proceed against the third parties who paid the net wages, because they were not "employers" under the Code and, therefore, were not liable for the taxes. S.Rep. No. 1708, 89th Cong., 2d Sess. 21–22, *reprinted in* 1966 U.S.Code Cong. & Ad. News 3722, 3742–43 [hereinafter cited as S.Rep. No. 1708]; H.R.Rep. No. 1884, 89th Cong., 2d Sess. 20 (1966) [hereinafter cited as H.R. Rep. No. 1884].

This practice, commonly known as "net payroll financing," was apparently quite prevalent in the construction industry. *See generally United States v. Algernon Blair, Inc.*, 441 F.2d 1379 (5th Cir.1971). In an attempt to keep work moving along smoothly, prime contractors would provide their financially troubled subcontractors with the funds necessary to meet their payrolls, *see id.* at 1381, or would help them arrange the necessary credit through a third-party lender, *see United States v. Coconut Grove Bank*, 545 F.2d 502, 505 (5th Cir.1977). However, anxious to limit their exposure on such transactions, the prime contractor or third-party lender typically provided the subcontractor funds only to the extent of its *net* payroll, thus making the government an unwilling "co-lender" of such loans to the extent of the withholding taxes due.

To stem this loss of revenue, Congress enacted section 3505. *See Coconut Grove Bank*, 545 F.2d at 505; *Algernon Blair, Inc.*, 441 F.2d at 1381. It imposes liability on lenders, sureties, and other third parties in two specific situations. First, section 3505(a) provides, in pertinent part, that:

> if a lender, surety, or other person, who is not an employer with respect to an employee ... pays wages *directly* to such an employee ... such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) required to be deducted and withheld [emphasis added].

Similarly, section 3505(b) provides, in pertinent part, that:

> [i]f a lender, surety, or other person supplies funds to ... an employer for the *specific purpose of paying wages* of the employees of such employer, with *actual notice or knowledge* ... that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required ... to be deducted and withheld by such employer ... such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer [emphasis added].

In short, Congress thought it fair to impose liability on third parties like Jersey Shore in these two situations, because they sit in essentially the same position vis-á-vis control over payroll funds and access to information as the employer itself. *See* S.Rep. No. 1708, at 22, 1966 U.S.Code Cong. & Ad.News at 3743 (observing that given the amount of information available to such third parties and the burden of proof upon the government, there is "no reason for distinguishing between the portion of the total wages which is owed and should be paid to employees ... and the portion of the wages which is owed and should be paid to the Government"); H.R. Rep. No. 1884, at 20 (*id.*).

With this background, we turn to the issue posed by the present appeal: Whether the government's failure to provide Jersey Shore with notice of the assessments

against Pennmount pursuant to I.R.C. § 6303(a) (1982) bars its suit to collect the Bank's liability under I.R.C. § 3505 (1982).

### III.

"When interpreting a statute, the starting point is of course the language of the statute itself. If the language is clear and unambiguous, and there is no 'clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *National Freight v. Larson*, 760 F.2d 499, 503 (3d Cir.) (citation omitted), *cert. denied,* —— U.S. ——, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985), *quoting Consumer Prod. Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Section 6303(a), the notice provision presently at issue, is found in Subtitle F of the Internal Revenue Code, which governs procedure under and administration of the internal revenue laws. It provides, in pertinent part, as follows:

### § 6303. Notice and demand for tax
### (a) General rule

Where it is not otherwise provided by this title, the Secretary shall, as soon as practicable, and within 60 days, after the making of an assessment of a tax pursuant to section 6203, give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof.

Jersey Shore argues that the phrase "each person liable for the unpaid tax" requires that notice of the assessment be sent not only to the persons against whom the assessment has been made, but to every third party who might be liable for the tax, including those liable under section 3505.

This interpretation of section 6303(a) concededly derives some support from a literal reading of the language of the statute. *See Associates Commercial Corp.*, 721 F.2d at 1098 (holding that "since Associates is a 'person liable for the unpaid tax' for the purposes of Section 6303(a), it is entitled to notice of the assessment of the unpaid tax mandated by that statute") (citation omitted); *accord United States v. Merchants Nat. Bank*, 772 F.2d 1522, 1524 (11th Cir.1985) (per curiam).[2] However, even "the use of the words of the statute as the primary guide to its interpretation requires an appreciation of the general purpose of the legislation so that literalism does not frustrate that purpose." *Schiaffo v. Helstoski*, 492 F.2d 413, 428 (3d Cir. 1974). A court must, therefore, look beyond the express language of a statute to give force to Congressional intent in two circumstances: "where the statutory language is ambiguous; and where a literal interpretation would thwart the purpose of the overall statutory scheme or lead to an absurd result." *International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp.*, 518 F.2d 913, 917–18 (9th Cir.1975); *see also Government of the Virgin Islands v. Berry*, 604 F.2d 221, 225 (3d Cir.1979) (" 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to ... an absurd consequence.... The reason of the law in such cases should prevail over its letter.' ") (quoting *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1868)). And any construction of a particular statute that would render all or part of the statutory scheme a "dead letter" is disfavored and to be avoided. *See Commissioner v. Bilder*, 289 F.2d 291, 298 (3d Cir.

---

**2.** In addition to the Seventh and Eleventh Circuits, the district courts that have addressed this question are in substantial agreement that failure to provide a third party with notice pursuant to section 6303(a) bars suit under section 3505(a) and (b). *See United States v. Messina Builders and Contractors Co.*, No. 84–0668–CV–W–9 (W.D.Mo. Oct. 11, 1985); *United States v. American Bank & Trust*, No. 84–5624, 623 F.Supp. 708 (E.D.Pa. Aug. 9, 1985); *United*

*States v. Hunter Eng'rs & Constructors*, No. 83–1305 (D.Hawaii Sept. 6, 1984); *United States v. United Cal. Bank*, No. C–80–3422–WAI (N.D.Cal. Feb. 14, 1985). *But see United States v. National Acceptance Co. of America*, 603 F.Supp. 1351, 1353 (E.D.Mich.1985) (rejecting *Associates Commercial Corp.*, and holding that the government may sue to collect a lender's liability under section 3505 without giving section 6303(a) notice).

1961), *rev'd on other grounds*, 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962).

### A.

First, unlike the Seventh Circuit, we find the "plain meaning" of the statute less than wholly unambiguous. Section 6303(a) not only requires the government to "give notice to each person liable for the amount of the tax," it also requires notice of a particular kind: i.e., one *"stating the amount and demanding payment thereof."* In other words, a section 6303(a) notice consists of two discrete elements: (i) notice of the amount that has been assessed and (ii) a *demand* that the individual receiving the notice *presently* satisfy that assessment. Thus, the plain language of the statute envisions a notice not unlike a typical creditor's dunning letter, providing the individual receiving it with one last opportunity to pay the taxes before the government invokes the full panoply of its administrative collection powers. *See generally* M. Saltzman, *IRS Practice and Procedure* ¶ 14.01 (1981) (comparing tax collection with debt collection under the Uniform Commercial Code); *see also id.* ¶ 14.03 (describing the processing of tax collection cases); McGregor & Davenport, *Collection of Delinquent Federal Taxes*, 28 S.Cal.Tax Inst. 589, 761–82 (1976) (describing the process of collecting delinquent withholding taxes) [hereinafter cited as McGregor & Davenport, *Collection of Delinquent Federal Taxes* ].

In sharp contrast to this type of notice is that contemplated by Jersey Shore and required by the Seventh Circuit. After *Associates Commercial Corp.*, the government must provide third parties like Jersey Shore with a copy of the notice of assessment and demand for payment sent to employers like Pennmount within sixty days of the assessment of such taxes. But such a notice serves quite a different purpose than that described above. First, it does not *demand* payment from the third party receiving the notice; nor does it even indicate the likelihood that the government will, at some time prior to the expiration of the applicable statute of limitations, look to that third party for payment. Similarly, such a "notice" will only fortuitously reflect the third party's potential liability, given both the differences between the taxes for which the employer and third party are liable and the limitations on liability contained within section 3505 itself. For example, the third party's liability is limited to those taxes required to be deducted and withheld from the employees' wages; it "is not liable for the employer's portion of payroll taxes." S.Rep. No. 1708, at 23; H.R.Rep. No. 1884, at 21, 1966 U.S.Code Cong. & Ad.News at 3744. The notice and demand sent to the employer, however, does include these amounts. Thus, it overstates the third party's potential liability. Similarly, under section 3505(b), the third party's liability is limited to twenty-five percent of the money lent, which may or may not equal the amount assessed against the employer. And unless the time period in which the third party paid net wages directly corresponds precisely with that reflected in the assessment, the third party's liability under section 3505(a) will not equal that shown on the notice sent to the employer.

Accordingly, we find that section 6303(a) can plausibly be read to support the position of both the government and Jersey Shore, thus justifying our resort to its legislative history and prior judicial treatment to determine its proper construction. In fact, to the extent we find the "plain meaning" of the statute controlling, we find the government's construction of the statute the more natural and logical reading of the language: i.e., section 6303(a) requires notice only to those individuals against whom the taxes have been assessed. *See Guide to the Internal Revenue Code of 1954*, 1955 U.S.Code Cong. & Ad.News 1183, 1621 ("Subsequent to a valid assessment of any tax liability, ... the Secretary ... must, as soon as practicable, and within 60 days, after the making of the assessment serve a notice on the *delinquent taxpayer* stating the amount due and demanding payment thereof.") (emphasis added; footnote omitted); Andrews, *The Use of the*

*Injunction as a Remedy for an Invalid Federal Tax Assessment*, 40 Tax.L.Rev. 653, 658 (1985) ("As soon as practicable, and within 60 days after making the assessment, the Service is required to give *the taxpayer* notice of the unpaid amount and demand for its payment....") (emphasis added).

## B.

Under the Internal Revenue Code of 1939, the predecessor statute to section 6303(a) explicitly applied only to the collection efforts of the tax Collector, who by statute was authorized to collect taxes solely by administrative means, such as levying on the taxpayer's property. I.R.C. § 3655 (1952).[3] By contrast, the Commissioner of Internal Revenue was authorized to bring civil suits to collect taxes owed. *Id.* § 3740. And it was long settled that the government's failure to assess its taxes did not preclude it from exercising its common-law right to sue for the taxes. *See, e.g., Macatee, Inc. v. United States*, 214 F.2d 717, 719–20 (5th Cir.1954).[4] It was equally well settled that where the government had assessed the taxes but failed to provide the taxpayer with notice of that assessment, it could still proceed by suit to collect the taxes owed. *United States v. Erie Forge Co.*, 191 F.2d 627 (3d Cir.1951), *cert. denied*, 343 U.S. 930, 72 S.Ct. 759, 96 L.Ed. 1339 (1952); *Jenkins v. Smith*, 99 F.2d 827 (2d Cir.1938); *see also Marvel v. United*

*States*, 719 F.2d 1507, 1513–14 (10th Cir. 1983) (alternative holding).

Where the government intends to proceed administratively to collect the taxes due, the need for the notice provided by section 6303(a) and its predecessor statutes is readily apparent. The 1939 and 1954 Codes both provide that upon assessment and demand, all of the taxpayer's property, both real and personal, becomes subject to a lien in favor of the United States. I.R.C. §§ 6321, 6322 (1982); I.R.C. §§ 3670, 3671 (1952). If the taxpayer neglects or refuses to pay the taxes within ten days after notice and demand, the government may levy on or distrain any property belonging to the taxpayer on which a tax lien exists. I.R.C. § 6331(a), (b) (1982); I.R.C. §§ 3690, 3692, 3700 (1952). And after levying on or distraining the taxpayer's property, the government may sell it to satisfy the taxes owed. I.R.C. §§ 6331(b), 6335 (1982); I.R.C. §§ 3693, 3695(a)–(b), 3712 (1952). Thus, given the scope of the government's power to collect summarily the taxes owed under this statutory scheme, the notice required by sections 3655 and 6303(a) plays an important role: "[t]he purpose of requiring such a notice and demand is for the protection of the taxpayer." *Macatee, Inc.*, 214 F.2d at 719.

Where, as under section 3505,[5] the government cannot proceed administrative-

---

**3.** Section 3655 provided, in pertinent part, that:
Where it is not otherwise provided, the collector shall ... within ten days after receiving any list of taxes from the Commissioner, give notice to each person liable to pay any taxes stated therein, ... stating the amount of such taxes and demanding payment thereof.

**4.** The government's right to bring suit in this fashion was based simply on its common-law right to sue on a debt, which exists independently of any statute. *See, e.g., Dollar Savings Bank v. United States*, 86 U.S. (19 Wall.) 227, 239–40, 22 L.Ed. 80 (1874); *Damsky v. Zavatt*, 289 F.2d 46, 51 (2d Cir.1946) (Friendly, J.).

**5.** Unlike its treatment of various other third-party liabilities, Congress did not authorize the Internal Revenue Service to assess separately third parties liable under section 3505, which would have empowered the government to proceed administratively. *Cf., e.g.,* I.R.C. § 6671(a)

(1982) (providing that liability under section 6672 is to be "assessed and collected in the same manner as taxes"). Rather, Congress apparently intended that liabilities under section 3505 be collected in civil proceedings only:
In the event a payor does not voluntarily satisfy the liability imposed by section 3505(a), the United States may collect such liability by appropriate civil proceeding....
In the event a supplier of funds does not voluntarily satisfy the liability imposed by section 3505(b), the United States may collect such liability by appropriate civil proceeding.
H.R.Rep.No. 1884, at 65–66; *see also United States v. First Nat. Bank*, 652 F.2d 882, 889 (9th Cir.1981) (holding that liability under section 3505 cannot be separately assessed); *United States v. Dixieline Fin.*, 594 F.2d 1311, 1313 (9th Cir.1979) (*id.*).

ly, the need for notice under section 6303(a) is not nearly so self-evident. If the government cannot assess the third party's liability, it cannot employ its summary collection methods against that party. Thus, such a third party is in no danger of having his property immediately seized or attached to satisfy the obligation. In a civil action, then, service of the government's complaint provides the party with all the notice and protection required; thus, the language "each person liable for the unpaid tax," then, refers only to those parties against whom the taxes have been assessed, and against whom the government can proceed administratively.

The Seventh Circuit, however, rejected any interpretation of section 6303(a) that differentiated between the manner in which the government attempts to collect the taxes owed:

> Section 6303(a) itself does not indicate that the right to notice is dependent upon which tax collection option the government uses. Section 6303(a) requires notice of the assessment of unpaid taxes in order to protect the person liable for paying the taxes, and this rationale applies regardless of which collection mechanism is used.

721 F.2d at 1100 (citations omitted). In so doing, it distinguished those cases beginning with *Jenkins v. Smith*, 99 F.2d 827 (2d Cir.1938) (per curiam), that stood for the proposition that the government's failure to give the notice required by section 6303(a) and its predecessor statutes barred only its right to collect the taxes administratively. It based this conclusion on what it apparently considered to be a critical organizational change in the statutory scheme enacted in 1954:

> *Jenkins* and its progeny do not support the government's position. Section 1545 [a predecessor to sections 3655 and 6303(a)] was part of a statutory scheme quite different from that of which Section 6303(a) is now a part. Under the earlier scheme, the tax Collector had no

authority to collect taxes by means of a civil proceeding, whereas under the Internal Revenue Code of which Section 6303 is a part, the Secretary of the Treasury ... may collect the unpaid tax by levy (§ 6331) or by civil proceeding (§ 7401).... By necessary implication, then, where, as here, the same official ... has power both to collect by levy and to authorize civil collection proceedings, ... the failure to provide [the] statutorily required notice bars both recovery methods.

*Id.* As we read the court's opinion, then, the court focussed primarily upon the official in whom the power to collect the taxes had been lodged, rather than on the means by which that official sought to collect them.

After an examination of the administrative and legislative history leading up to the enactment of the Internal Revenue Code of 1954, we find that the Seventh Circuit misconceived the effect of any organizational changes wrought by its enactment. Consideration of the relationship between section 6303(a) of the 1954 Code and its predecessor statutes, combined with an appreciation of the organizational changes effected by President Truman prior to the enactment of the 1954 Code, leads us to conclude that the critical variable is the manner in which the government seeks to collect the taxes, not the official entrusted with that power. Thus, section 6303(a) requires notice only to those individuals against whom the government can proceed administratively.

First, the Committee Reports accompanying section 6303(a) indicate that Congress intended to make only "two changes from existing law," neither of which affects who is entitled to notice of an assessment. H.R.Rep. No. 1337, 83d Cong., 2d Sess. A405–06, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4017, 4553; S.Rep. No. 1622, 83d Cong.2d Sess. 574, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 5222–23.[6]

---

**6.** Specifically, Congress intended that notice and demand be given as soon as practical but no

later than sixty days, rather than within ten days after receipt by the Collector of the Com-

Second, the organizational changes that the court placed so much weight on in *Associates Commercial Corp.* resulted not from Congressional action with respect to the 1954 Code, but from executive action under the 1939 Code. The current organization of the Internal Revenue Service stems from two reorganization plans promulgated by President Truman in 1950 and 1952, which Congress subsequently incorporated by reference when it enacted the 1954 Code. I.R.C. § 7804 (1982); *see also* 4 B. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 110.1, at 110–2 to –3 (1981); 9 J. Mertens, *The Law of Federal Income Taxation* § 49.02 (rev. ed. 1982). For example, the power to collect taxes both administratively and by means of a civil proceeding was first vested in the Secretary of the Treasury *under the Internal Revenue Code of 1939* by Reorg.Plan No. 26 of 1950, 15 Fed.Reg. 4935 (1950), *reprinted in* 5 U.S.C.A. app. at 274–75 (West 1967) [hereinafter cited as Reorg. Plan No. 26]. Similarly, the office of the Collector was abolished not by the enactment of the 1954 Code, but by the Reorg. Plan No. 1 of 1952, 17 Fed.Reg. 2243, *reprinted in* 5 U.S.C.A. app. at 280–81 (West 1967) [hereinafter cited as Reorg.Plan No. 1].

In neither case is there any indication that the President intended any change with respect to who was to receive notice of an assessment under the 1939 Code. Rather, the reorganizations had two primary goals: first, to increase the efficiency of the Department of the Treasury and the Internal Revenue Service; and second, to assure the honest and impartial administration of the internal revenue acts. *See* Message of the President, Reorg.Plan No. 26, 5 U.S.C.A. app. at 275 ("the reorganizations contained [herein are] essential to clarification of the lines of authority and responsibility in the executive branch"); Message of the President, Reorg.Plan No. 1, 5 U.S. C.A. app. at 281 ("A comprehensive reorganization of [the Internal Revenue Service]

is necessary both to increase the efficiency of its operations and to provide better machinery for assuring honest and impartial administration of the [tax] laws."). In fact, to the limited extent that the administrative history speaks to this issue, it indicates an intent not to change the law substantively. *See, e.g.,* Bureau of Internal Revenue, Operations Reorganization Order No. 3, 17 Fed.Reg. 8126 (1952) (delegating to each Director of Internal Revenue all functions relating to the assessment and collection of taxes and the accountability therefore of the predecessor office of the office of Collector of Internal Revenue in order to preserve the right to maintain suit for the refund of taxes); *see also* T.D. 5900, 17 Fed.Reg. 4464 (1952).

 Under these circumstances, we find that Congress did not intend to change the law with respect to who must receive notice when it enacted section 6303(a). Congress was fully aware of the changes wrought by Reorg.Plan No. 26 and Reorg. Plan No. 1 when it enacted the 1954 Code. It only follows that the Congress would adapt the language of the Code to fit the existing organization of the Department of the Treasury and the Internal Revenue Service. Thus, absent any legislative history to the contrary, we find that section 6303(a), like its predecessor statute under the 1939 Code, only requires notice to those individuals against whom the government can proceed administratively. As a result, the government's failure to provide Jersey Shore with a copy of the notice of assessment and demand for payment sent to Pennmount does not bar its suit to collect the Bank's liability under section 3505.

### C.

Careful consideration of the substantive requirements of section 3505 further buttresses our conclusion that section 6303(a) does not require notice to parties like Jersey Shore. In construing section 6303(a) to

missioner's certified list of assessments; and that, except in the case of a jeopardy assessment, payment was not to be demanded prior to

the last date prescribed by law for the payment of the tax.

require notice to third parties like Jersey Shore, the Seventh Circuit was apparently concerned that unless such notice be given, third parties like Jersey Shore would have no reason to suspect that they may be liable under section 3505, to their ultimate prejudice. *See* 721 F.2d at 1099–1100. A similar concern has been voiced by other courts that have addressed this question. *See, e.g., United States v. American Bank & Trust,* 623 F.Supp. 708, 710 (E.D.Pa.1985) (observing that "any potential burden [on the government] is outweighed by the possibility of prejudice to the lender not receiving notice"); *United States v. Associates Commercial Corp.,* 548 F.Supp. 171, 174 (N.D.Ill.1982).

However, in light of the burden of proof placed upon the government by section 3505, we find this concern to be generally unfounded. By definition, section 3505 liability only arises if the the third party (i) has actual knowledge that the employer does not intend to or will not pay over the taxes the taxes required to be withheld, or (ii) is itself directly paying net wages. In either situation, the third party is, of necessity, actually or constructively aware of its *potential* liability for the the taxes required to be deducted and withheld. Viewed in this light, the notice required by *Associates Commercial Corp.* communicates no additional information; thus, it serves no useful purpose. *Cf. United States v. Dixieline Fin.,* 594 F.2d 1311, 1312–13 (9th Cir.1979) (holding that no independent assessment is required under section 3505(b), because it would serve no useful purpose). Quite to the contrary, construing section 6303(a) as the Seventh Circuit did simply adds an additional formalistic requirement for the imposition of section 3505 liability—a requirement upon which parties liable under section 3505 can rely, thereby thwarting Congress' intent to recover the unpaid withholding taxes from such persons.

Although we do not intend to downplay the potential burden resulting from our construction of section 6303(a), we find the legislative history of section 3505 quite instructive on the question of prejudice to parties like Jersey Shore. When it enacted section 3505, Congress expressly considered the steps that third parties should take to protect themselves:

> [S]ureties can protect themselves against any losses attributable to withholding taxes by including this risk of liability in establishing their premiums, and lenders by their including the amounts in their loans and taking adequate security.

S.Rep. No. 1708, at 23; H.R.Rep. No. 1884, at 22, 1966 U.S.Code Cong. & Ad.News at 3744. In other words, Congress envisioned a system in which third parties would take their potential liability under section 3505 into consideration at the time they entered into the transaction exposing them to liability under the statute.

Moreover, by taking steps to protect themselves at the inception of such transactions, rather than at the time the government assesses the taxes against an employer like Pennmount,

> losses now borne by the Government will fall (as it should) on the employers in the form of a larger bonding, or other fee or cost they must pay. Since the withholding taxes are, in true character, a part of the wages, it seems only appropriate that this cost be borne by the employers in the same manner as is true of the net wage costs.

S.Rep. No. 1708, at 23; H.R.Rep. No. 1884, at 22, 1966 U.S.Code Cong. & Ad.News at 3744. Thus, our construction of the two statutes furthers Congress' intent with respect to section 3505, without substantially prejudicing the rights of third parties like Jersey Shore.

### D.

The government also argues that requiring section 6303(a) notice for third parties subject to section 3505 liability will, in effect, render the latter statute a "dead letter," thereby thwarting Congress' intent to provide an additional source from which to recover unpaid withholding taxes. In *Associates Commercial Corp.,* the Seventh

Circuit rejected this argument as "highly speculative and unsupported by any convincing statistics." 721 F.2d at 1099. We disagree; in light of the manner such taxes are collected, available statistics and common sense both dictate that such a requirement would impose a prohibitory investigative burden on the government.

First, given the number of returns involved, the government cannot be expected to initiate an investigation each time a taxpayer files a return but fails to pay his full tax liability. For example, in 1973 employers filed 2.3 million withholding tax returns with unpaid balances. McGregor & Davenport, *Collection of Delinquent Federal Taxes*, at 768. Similarly, in that same year individual taxpayers filed 3.8 million returns with unpaid liabilities. *Id.* at 601.

Second, even assuming that the resources were available, an immediate full-scale investigation in all cases involving delinquent tax payments would constitute a significant waste of government resources. Under ordinary circumstances, the problem can be dealt with more efficiently by sending the taxpayer a series of notices, as would be done by any other creditor in a similar situation. For example, in 1980 the Internal Revenue Service sent individual taxpayers 7.05 million first notices for balances due, but only 2.3 million TDA's or Taxpayer Delinquent Accounts (which result only after attempts to collect by notice fail) were issued for *all* types of returns, including individual returns. Internal Revenue Service, *Quarterly Statistical Report*, at 20–21 (Dec.1980); *see also* McGregor & Davenport, *Collection of Delinquent Federal Taxes*, at 602–05 & n. 22 (discussing TDA's). Similarly, of the 2.3 million unpaid withholding returns filed in 1973, approximately 0.8 million were paid in response to such notices, and only 1.5 million TDA's were issued. *Id.* at 768–69.

Finally, both Jersey Shore and the district court implicitly recognize this problem by suggesting that the government should delay assessing the employer-taxpayer for up to three years, thereby permitting it to identify third parties who might be liable for the taxes. This suggestion, however, would seriously jeopardize the government's interest in collecting the taxes from the employer, because such a practice would enable other creditors to obtain prior liens against the employer's property. As a result, this would seriously undermine the fundamental "purpose of the federal tax lien statute to insure prompt and certain collection of taxes due the United States from tax delinquents." *United States v. Security Trust & Savings Bank*, 340 U.S. 47, 51, 71 S.Ct. 111, 113, 95 L.Ed. 53 (1950).

Under these circumstances, we are forced to conclude that liability under section 3505 would be rendered a substantial nullity if, as an absolute prerequisite for collection, the government is forced to give third parties such as Jersey Shore notice of its assessment against the taxpayer within sixty days.

### V.

Accordingly, the judgment of the district court will be reversed and the cause remanded to the district court for further proceedings consistent with this opinion.

WEIS, Circuit Judge, dissenting.

The issue in this case is not complicated—it is simply whether we read the Internal Revenue Code as Congress wrote it or as the Internal Revenue Service would like us to amend it. In clear terms, § 6303(a) states that the Secretary of Treasury "shall, as soon as practicable, and within 60 days, after the making of an assessment of a tax pursuant to section 6203, give notice to each person liable for the unpaid tax."

The reference to "each person liable" in § 6303 is not in the least ambiguous. In the case at hand, the government contends that defendant is liable for the tax. Therefore, it seems inescapable that defendant should have been given notice.

The IRS wishes us to redraft that section so that it requires notice only to those individuals against whom taxes have been assessed. The reasons offered for this re-

vision have some logic and would possibly ease administrative burdens on the government, but the arguments are directed to the wrong forum. They should be presented to Congress, not the courts.

In *Iselin v. United States*, 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926), the Supreme Court said that courts should not revise a statute so that "what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function."

The courts' limited role was reemphasized in *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117(1978). Once "Congress has spoken in the plainest of words" and "the meaning of an enactment is discerned ... the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto." Courts may not "pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.' Our Constitution vests such responsibilities in the political branches." *Id.* at 194–95, 98 S.Ct. at 2301–02.

In this case, I cannot even say with assurance that the addition to the statute that the IRS proposes was inadvertently omitted. Certainly, the legislative history of § 6303 provides no basis for such a belief. Moreover, the legislative history of § 3505 does not suggest that notice should not be provided lenders who may be secondarily liable. "Congressional silence, no matter how 'clanging' cannot override the words of the statute." *Sedima v. Imrex Co., Inc.*, — U.S. ——, 105 S.Ct. 3275, 3285 n. 13, 87 L.Ed.2d 346 (1985).

It bears mentioning that the dispute here is not about a meaningless formality. The assessment of taxes against Pennmount had the effect of enlarging the statute of limitations against defendant bank for six years. 26 U.S.C. § 6502(a)(1). *United States v. Associates Commercial Corp.*, 721 F.2d 1094, 1097 (7th Cir.1983). The likelihood of prejudice because of the loss or destruction of records by one secondarily liable is real and substantial. *United States v. Associates Commercial Corp.*, 548 F.Supp. 171, 174 (N.D.Ill.1982).

The net effect of the Code revision urged by the IRS is to give less procedural protection to one secondarily liable than to the primary obligor. The notice of assessment will alert the taxpayer directly liable to the lengthened statute of limitations. He may then preserve pertinent records, arrange for payment, compromise, or take other steps in his own best interests. Without notice of the assessment, however, the party liable under § 3505 may not be alerted to his continuing exposure and concomitant risks. I am not convinced that Congress intended such an anomalous result.

Two courts of appeals have already rejected the precise arguments advanced by the government in this case. *See United States v. Merchants Nat. Bank of Mobile*, 772 F.2d 1522 (11th Cir.1985) and *United States v. Associates Commercial Corp.*, 721 F.2d 1094 (7th Cir.1983). I find the IRS position no more persuasive than did those courts, and I join their insistence that the government adhere to the clear mandate of the statute.

The Internal Revenue Code has never been noted for facile comprehension, and dogged plodding through it uncovers little of cheer to any taxpayer. The challenged clause is an oasis of clarity in that desert of dull, deadly detail, but even here the IRS, would pile a sandy gloss on the language to obscure the obvious. In *Temple University v. United States*, 769 F.2d 126, 139 (3d Cir.1985), I saw "no need for the court to be unduly solicitous about curing statutory deficiencies to aid the IRS in doubtful cases." That protest applies even more here where the government's case is less meritorious.

I dissent.