Phyllis C. BARONE, Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA, an insurance company, Defendant.

No. 00–CV–73626–DT.

United States District Court, E.D. Michigan, Southern Division.

Jan. 31, 2002.

Eric R. Bryen, Eric R. Bryen Assoc., Farmington, Hills, MI, for Plaintiff.

Stephen L. Witenoff, Thomas, DeGrood, Southfield, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

### I. FACTS

Plaintiff Phyllis Barone ("Barone") filed the instant cause of action against Defendant UNUM Life Insurance Company of America ("UNUM") on July 10, 2000 in the 6th Judicial Circuit Court. Plaintiff is a resident of the Township of West Bloomfield in the County of Oakland. Defendant is a Delaware corporation which conducts business in the County of Oakland. On August 11, 2000, this cause of action was removed to the district court for the Eastern District of Michigan based upon a federal question (ERISA).

Plaintiff was hired by USA Networks on February 1, 1989 as an account executive.

Plaintiff sold advertising time for the network in the states of Ohio and Michigan. On April 1, 1989 as a part of Plaintiff's benefits package, she became eligible for long term disability which covered through Defendant. On May 25, 1992 at the age of thirty-five (35) years old, Plaintiff suffered a stroke with bleeding on the brain. Plaintiff returned to work on January 4, 1992, but began to experience some difficulties as a result of the stroke. Plaintiff contended that her job caused her headaches and such stress increased the likelihood of rebleeding on the brain. In July of 1993, Plaintiff became totally disabled. Plaintiff filed a disability claim with Defendant. In compliance with the long term disability policy, Defendant reviewed Plaintiff's claim and began to pay her $5,063.38 per month in benefits. In November of 1999, Plaintiff's benefits were terminated. Defendant states that there is no objective evidence that stress would cause Plaintiff further problems with cerebral cavernous hemangioma ("CCH") or that headaches were the predictor of such problems. Defendant also asserts that records from the Cleveland Clinic, the Mayo Clinic and the medical literature do not support Plaintiff's contention that she cannot perform the material duties of her occupation.

Plaintiff contends that Defendant has breached its duty to pay disability benefits under the policy. The parties have filed cross motions for the entry of judgment which are now before this Court.

### II. STANDARD OF REVIEW

■ In *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609 (6th Cir.1998), a panel of the Sixth Circuit, in a majority decision, set forth "Suggested Guidelines" to adjudicate ERISA benefit denial actions.[1] *Id.* at 619. The panel began by

---

1. The panel included, Judges Ryan, Cole and Gilman. Judge Cole wrote the judgment of

the court, which all three judges agreed to, affirming the district court's decision granting

noting that a district court's review of a plan administrator's decision is confined to the evidence which was before the plan administrator. *Id.* at 618 (citing *Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 437 (6th Cir.1997); *Perry v. Simplicity Engineering*, 900 F.2d 963, 966 (6th Cir.1990)). The Suggested Guidelines provide that the district court should conduct a review of the plan administrator's decision based solely upon the administrative record and render findings of fact and conclusions of law. *Id.* Only if a procedural challenge is alleged, such as lack of due process afforded by the administrator or bias on its part, may the district court consider evidence outside of the administrative record. *Id.* Discovery must be limited to these procedural challenges. *Id.*

## III. ANALYSIS

### A. *Plaintiff's Motion for Entry of Judgment*

Plaintiff asserts that when her disability benefits were terminated in August of 1999, the termination was done without regard to due process. It is Plaintiff's position that Defendant's decision was directly contrary to the recommendations and studies in Plaintiff's medical file. Pursuant to the terms of the policy, disability or disabled is defined as:

1. The insured cannot perform each of the material duties of his regular occupation, or

2. The insured while unable to perform all of the material duties of his regular occupation on a full time basis, is:

   a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

   b. earning currently at least 20% less per month than this indexed pre-disability earnings due to that some injury or sickness.

Plaintiff interprets the above definitions to mean that Plaintiff is entitled to same benefits as long as her monthly disability income does not exceed $6,752.10 which is 80% of her prior disability income ("PDI") of $8,438.96 per month.

Plaintiff asserts that she has had no earnings after 1992. It is Plaintiff's position that in order for Defendant to terminate her benefits, Defendant is required to show that Plaintiff is able to perform all of the material duties of her job on a full time basis, or that in the alternative if she is not performing all of the material duties of her occupation, that she is earning more than 80% of her PDI or an amount in excess of $6,571.17 per month.

Plaintiff argues that Defendant did not even attempt to reduce her benefits but merely terminated them. Plaintiff asserts that she had no employment earnings as evidenced by her tax returns and 1099's. Plaintiff argues that UNUM's motive for terminating her benefits was to save money despite Defendant's obligation to pay in excess of $60,000 per year until Plaintiff reaches the age of 65. Plaintiff states that Defendant offered Plaintiff a lump settlement sum of $175,000 in January of 1997 and when Plaintiff refused her benefits were eventually terminated. On July 14, 1999, Plaintiff's third claim representative sent Plaintiff correspondence stating that it had come to Defendant's attention that Plaintiff had been or was working. Plaintiff, then, disclosed that she was volunteering for On Course Marketing, a company

judgment in favor of the Plan Administrator and affirming the district court's ruling that no evidence which was not submitted to the Plan Administrator is to be considered by the court. Judge Gilman wrote the opinion regarding the use of "Suggested Guidelines" in lieu of the summary judgment or bench trial standards, which was agreed to by Judge Ryan, but not by Judge Cole.

owned by Plaintiff's significant other. Plaintiff asserts that Defendant was aware that Plaintiff was looking for something to do and encouraged her to do so. Plaintiff's intent to start a business was within Defendant's knowledge. (See Claim File, p CL 0127). Plaintiff states that because Plaintiff has received no income for her participation with On Course Marketing her benefits should not be terminated.

Plaintiff also argues that the medical evidence does not support a finding that she is not disabled and incapable of performing all the material tasks of her occupation on a full time basis. Plaintiff cites the testimony of Dr. Lawrence Eilender, Plaintiff's treating physician, which states "[i]f she (Plaintiff) rebleeds from stress at work, I am not responsible for that. Emotional stress can precipitate a rebleed episode." (Claim File, p CL 0656). Dr. Eilender also stated:

> I felt that she needs to be disabled from her job that she was engaged in prior to that bleed ... I have told her that she cannot go back to her job and I never okayed that she could go back to the job from the form that was sent to UNUM ... Again I never said that she could return back to her regular job and in actuality I put a disclaimer on the sheet ... I would recommend that she stay totally disabled at this particular time and I have always recommended that due to the risk of bleeding in her brain ....

(Claim File, p CL001186–001187).

Plaintiff asserts that Defendant relied upon the oral statements from Elise Kornfield, an employee in the human resources department of USA Networks. Ms. Kornfield allegedly stated that the On Course duties were the similar to the duties performed at USA Network. Plaintiff asserts that all material duties must be performed on a full time basis. Plaintiff states that she is only volunteering 200 hours per year at On Course versus the 3000 hours a year she worked while at USA Network. Kornfield also told Defendant's representative Davie that she did not have a job description for Plaintiff (Claim File, p CL 0367).

Plaintiff asserts that the occupational therapists and the physician of UNUM as well as Dr. Abbot agree that she is disabled. Mr. Halton, a UNUM claim representative stated, "based upon my review of the file the claimant is clearly totally disabled and recovery is quite unlikely." (Claim File, p CL1339). Christine L Kromer, UNUM claim representative wrote, "based on my review of the file claimant is totally disabled own occupation, and recovery is unlikely." (Id. at CL 1339). Plaintiff asserts that UNUM never requested an independent medical examination prior to terminating benefits. Dr. Eilender, Plaintiff's personal physician has stated that Plaintiff's "activities do not involve the same metered tasks for the same duration as her previous job, from [his] interview with Ms. Barone." On Course Marketing is more a recreational hobby. (Claim file, p CL 1186). Therefore, Plaintiff states that Defendant cannot be permitted to assume that Plaintiff can return to work absent an independent medical evaluation or some objective evidence from a medical evaluation.

Defendant responds that the burden is on Plaintiff to prove that she is unable to perform the material duties of her occupation in order to recover benefits under the Policy. Defendant asserts that Plaintiff must prove that because of injury or sickness, she is unable to perform each of the material duties of her regular occupation. Pursuant to the Policy, Defendant is only required to pay Plaintiff benefits where Defendant "receives proof that an insured is disabled." Proof must be provided to Defendant upon request. Defendant cites *Miller v. Metropolitan Life Ins. Co.*, 925

F.2d 979, 985 (6th Cir.1991), for the proposition that "once disability benefits are conferred, the burden of proof lies with the insurance company to prove that the employee can return to her former regular employment. However, under the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company." Defendant argues that the evidence in the claim file rebuts Plaintiff's disability claim. Defendant argues that Plaintiff's position that return to a stressful environment would cause further medical problems is unsupported. Defendant cites the report of Dr. Hogan, UNUM's physician, in support of its position. Defendant also states that any testimony from Plaintiff is less than credible because Plaintiff has misrepresented her condition and activities.

Defendant asserts that the language of the Policy does not mandate an independent examination but instead gives Defendant the discretion to do so. Defendant again cites *Miller* for the proposition that "the insurance company need not request an independent examination by one of its physicians unless the employee first submits proof of continuing disability." Defendant argues that Plaintiff's own doctors could not agree that Plaintiff's return to work would cause further problems. Defendant states that the medical evidence shows Plaintiff's condition to be stable.

Defendant argues that Plaintiff is required to prove that she is unable to perform the material duties of her regular occupation due to her injury or sickness and Plaintiff has failed to do so. Defendant points to several alleged deficiencies in Plaintiff's claim:

▶ there is no objective medical evidence that stress caused Plaintiff's condition;

▶ there is no objective evidence that stress could further contribute to Plaintiff's condition;

▶ Dr. Eilender's opinion that Plaintiff cannot return to work is contradicted by his opinion that Plaintiff's job will not increase the likelihood of further medical problems;

▶ treaters at the Mayo and Cleveland Clinic never stated that work-related or other stress would cause Plaintiff further medical problem;

▶ medical literature does not list stress as a causative factor, and does not link headaches to any potential medical problems for Plaintiff;

▶ Dr. Eilender's opinion is based upon Plaintiff's subjective reports of symptoms which puts Plaintiff credibility at issue and the records shows that Plaintiff lacks credibility.

Defendant states that speculation regarding possible medical problems does not constitute proof of disability. In *Simpson v. Ameritech Corp., Inc.,* 2000 U.S. Dist. Lexis 14607, 2000 WL 1480893 (E.D.Mich.2000), the plaintiff quit work based upon problems with carpal tunnel syndrome. After plaintiff's condition was resolved, plaintiff sought disability benefits based upon a claim by her doctor that return to work could place her at risk of developing further problems. The court stated that such evidence was insufficient to prove entitlement to disability benefits. In *Verrette v. Northwestern Mutual Life Ins. Co.,* 1986 U.S. Dist. Lexis 30997 (W.D.Mich.1986), plaintiff was not entitled to benefits where a return to the stressors of work could have cause him to have another heart attack. There was no objective evidence that the return to work was life threatening. The court stated where a physician merely repeats the complaints of his patient, that is not sufficient objective evidence.

Defendant asserts that the claims of Plaintiff are rebutted by the testimonies of Drs. Hogan, Abbott and the doctors at the Mayo and Cleveland Clinic. Defendant states that Plaintiff lacks credibility because Plaintiff hid her activities and lied about her condition. It is Defendant's position that Plaintiff misrepresented her condition to UNUM. Plaintiff painted a picture of a virtual invalid which Defendant states is not true. Plaintiff stated that surgery was impossible but the surgery was not necessary because Plaintiff recovered, her residual symptoms were mild and Plaintiff was doing well neurologically.

## B. *Defendant's Motion for Judgment Affirming ERISA Determination*

Defendant asserts that Plaintiff's lack of total disability is the reason for the termination of Plaintiff's benefits. Defendant offers the following evidence as support. After Defendant approved Plaintiff's disability benefits on August 10, 1993, Defendant repeatedly offered Plaintiff rehabilitation assistance. Several calls were made to Plaintiff which Plaintiff failed to answer until December of 1993. Plaintiff agreed to call Defendant back after the holidays regarding the rehabilitation. The rehabilitation file was closed in January of 1994 because Plaintiff had not responded. In June of 1994, Plaintiff was again contacted regarding rehabilitation and on July 6, 1994, correspondence was forwarded regarding rehabilitation. Plaintiff responded that she would discuss such options with her doctor. The rehabilitation coordinator noted that Plaintiff did not appear interested in rehabilitation.

Defendant also asked that Plaintiff apply for Social Security Disability Income. In March and April of 1995, Defendant asked Plaintiff about the status of her SSDI benefits. Plaintiff responded on April 25, 1995 and left a message that she applied for SSDI benefits in July of 1994 but was denied. Defendant returned Plaintiff's April 25 phone call and left a message. Plaintiff responded on May 2, 1995 stating she had no interest in appealing the SSDI decision. Plaintiff again telephoned on July 27, 1995 stating her intention to reapply for SSDI benefits. An update on the status of the SSDI benefits was requested in November of 1995. Plaintiff responded in February of 1996 stating the Social Security Administration had lost her paperwork. In April of 1996, Defendant sent Plaintiff a form for her signature to authorize the production of a copy of Plaintiff's SSDI file. Plaintiff never returned the form. On September 23, 1996 after a request was made for an update on the status of Plaintiff's SSDI claim, Plaintiff reported that she reapplied for SSDI benefits and was awaiting a decision. In October of 1997, Plaintiff again stated that the Social Security Office could not find her paperwork.

Defendant asserts that in December of 1993, Dr. Eilender reported that Plaintiff could not return to work because of emotional stress. However, Plaintiff could work in a low stress environment. Plaintiff has seen four neurologists all with opinions which were not definite. In April of 1994, Plaintiff was released to return to work in a low stress environment but Plaintiff reported to Dr. Eilender that she was having headaches and dizziness. Plaintiff did not report double vision, slurred speech, elevated blood pressure or weakness in arms and leg. Plaintiff did have slight ataxia on the left side of her body.

Dr. Eilender reported in August of 1994 that Plaintiff was doing volunteer work at golf tournaments but continued to experience headaches and fatigue such that return to work would cause a re-rupture. Plaintiff also represented to a claims representative that she spent her time mostly

with family, reading, at the library and driving in Detroit.

In November of 1995, Plaintiff submitted a supplemental statement of disability on which Plaintiff's daily activities were listed as "walk, read, attempt to make meals, maintain a low stress environment." On September 23, 1996, Plaintiff continued to assert that activities were limited to maintaining a low stress environment and taking occasional walks. Plaintiff's activities remained the same through April of 1997. On October 15, 1997, Defendant unsuccessfully tried to contact Plaintiff by phone. Plaintiff responded on November 4, 1997 after asserting that she never received Defendant's messages. Headaches, fatigue and migraines were reported. Plaintiff asserted that she continued to see Dr. Eilender every 3 to 4 months and was not interested in returning to work.

In July of 1998, Defendant requested information on Plaintiff's medical status. Plaintiff left a message that she would provide the required information after her August 28, 1998 visit with Dr. Eilender. When Plaintiff failed to provide Defendant with the requested information, Defendant telephoned Dr. Eilender's office and was told that Plaintiff's last appointment was in November of 1997. Plaintiff responded that the information from Dr. Eilender's office was incorrect.

A December MRI revealed that Plaintiff's condition was stable. On January 20 and February 12, 1999, Defendant attempted to ask Plaintiff about her SSDI application but received no response after follow-up calls were made on March 24, 25, 26 and 29. As a result, Defendant's representative noted in the file that Plaintiff was never home to respond to phone calls, never returned messages which led the representative to believe that Plaintiff was leading a more active lifestyle than indicated. Defendant decided to conduct surveillance on June 7, 16 and 17, 1999. Plaintiff was observed driving, socializing with friends, dining at a restaurant and playing 18 holes of golf. Plaintiff has also performed advertising work such as marketing, distribution and advertising sales for Southern Michigan Golfer magazine since 1995.

Defendant discovered that Plaintiff had been the owner of On–Course Marketing as well as conducting marketing and advertising work for Michigan golf courses. USA Network informed Defendant that the activities disclosed through the investigation were the same type of activities performed prior to Plaintiff's disability. Following the surveillance in June of 1999, Defendant implemented a full investigation of Plaintiff. In October of 1999, Defendant requested additional information regarding Plaintiff's activities. Plaintiff responded that she occasionally went golfing with her significant other's clients but this did not constitute work. Plaintiff stated that she was not a shareholder, director or officer of On Course Market but was merely a volunteer. This volunteer work allegedly provided Plaintiff with some physical activity. Defendant informed Plaintiff that it would pay her three months of benefits pending the completion of its investigation. Dr. Eilender was contacted on November 12, 1999 and asked to indicate whether he agreed with Defendant's analysis of Plaintiff's condition. Defendant asserted that Plaintiff was working and performing duties which were consistent with her previous job, that the fear of stress was inconsistent with the ability to handle everyday life stressors, that the policy only provided for current disabilities and not speculated ones. Defendant stated that Dr. Eilender agreed with its assessment but stated that he would not be liable for any recurrent bleeding. On November 30, 1999, Defendant informed Plaintiff that it was terminating her benefits. Plaintiff notified De-

fendant of her request for an appeal on December 7, 1999 providing Defendant with a letter from Dr. Eilender stating that he did not agree with Defendant's previous letter. [Claim File, p CL–1187]. Dr. Eilender also opined that golfing was not a stressful occupation and Plaintiff was permitted to engage in such an activity.

Defendant summarized the findings of the investigation it conducted on Plaintiff's activities. Defendant asserts that Plaintiff is listed as the President and later as the Vice President of On Course Marketing, a business established in 1995. The company address is that of Plaintiff. Plaintiff and Jeff Tingley, Plaintiff's significant other, signed the On Course Marketing Articles of Incorporation. Jeff Tingley told Defendant that Plaintiff merely ran errands for him in connection with On Course Marketing. However, when Defendant contacted numerous advertisers, they denied any knowledge of Tingley stating that they dealt directly with Plaintiff. Defendant also contends that Plaintiff is the owner, independent distributor and contact person for Southern Michigan Golfer. Defendant was informed that archived editions of the Southern Michigan Golfer could be obtained from Plaintiff. Advertisements for a full page in the magazine cost $800 and a half page cost $400. Defendant estimates that the total revenue for one issue at $14,400. Defendant claims that Plaintiff's contact with Southern Michigan Golfer was terminated in 1999 when Network Publication, the owner of Southern Michigan Golfer was purchased by Frey Media. Defendant contends that it was informed by a representative of Network Publication that Plaintiff managed the advertising and publication of the magazine which included finding advertisers.

Defendant reviewed Plaintiff's medical records from the Mayo and Cleveland Clinics in 1992 and 1993. In 1992, the records revealed that although Plaintiff continued to complain of severe headaches and mild residual left hemiparesis with unsteady gait, there was no indication of other significant major neurological defects. Defendant contends that Plaintiff declined possible surgery. Plaintiff was cautioned to limit excessive strenuous activity and anticoagulant therapy was contraindicated. Plaintiff was told to avoid pregnancy. Stress was not identified as a limitation. In 1993, Plaintiff's condition was improved except for left side incoordination and weakness which manifested itself during stress and demanding physical activity. An MRI showed that the pontine hemorrhage was resolved substantially. Plaintiff again declined the surgery. When Plaintiff saw Dr. Harper at the Mayo clinic for a neurological examination, he stated that the examination was unremarkable except for evidence of left hemiparesis. No stress or headaches were mentioned.

Defendant referred its file to Dr. Sharon Hogan, an in-house physician for evaluation. Dr. Hogan was asked to assess both the restrictions and limitations in order to determine if there were any objective findings regarding the probability of a stress induced stroke reoccurrence. Dr. Hogan found that while lesion location, age, gender, state or reproductive cycle and previous hemorrhage were risk factors, hypertension and stress were not. Dr. Hogan also stated that a study published in the Journal of Neurosurgery noted that headaches were not a significant predictor of hemorrhage. Dr. Hogan concluded that "there is no data to support the assertion that stress in this insured has significantly raised her blood pressure, and there is no data to support the theory that any elevated blood pressure increases the risk of rebleeding." (Claim File, p CL–1253). Dr. Hogan stated that stress is unavoidable and if stress had been a significant issue

there was no effort to assist Plaintiff in managing stress. Dr. Hogan stated that Plaintiff's physical limitations are mild and functionally she should have full time sedentary or light work capacity. Defendant contends that Plaintiff's symptoms are purely subjective and that Dr. Eilender's opinion is based entirely on Plaintiff's complaints. It is Defendant's position that Plaintiff's description of headaches are inconsistent with her description of headaches to Dr. Issam Awad at the Mayo Clinic. Defendant asserts that based upon its investigations, the records from the Cleveland and Mayo clinics and Dr. Hogan evaluation that Plaintiff is able to perform the material duties of her occupations such that terminations of her disability benefits were proper.

■ Defendant rely on the reports of Dr. Hogan and the reports from the Mayo and Cleveland Clinic which indicate that stress was not a factor in determining whether Plaintiff was at risk for another stroke. The general consensus is that Plaintiff is at risk for a rebleed. Dr. Abbott stated that the bleeding on Plaintiff's brain was a horrible event and that Plaintiff is lucky that she lived. [Claim File, p CL—0697]. The mortality rate is very high in these types of cases which are rare. *Id.* Dr. Abbot further stated that there is a risk that pressure may cause it to burst. *Id.* When questioned whether stress could cause a rebleed. Dr. Abbot responded "that although AP's statement of stress causing the vessel to burst is a little overdoing it but, it is possible." *Id.*

In his July 30, 1993 assessment, Dr. Eilender stated that Plaintiff could not continue to work after 7/2/93 was because [Plaintiff] was excessively fatigued at her work and could not keep up with the demand of her work. She was asked to drive excessive miles and work long hours. She was aggravated by her co-workers and this [caused] her to be under an undue amount

of stress. (Claim File, p CL—699). Dr. Eilender also stated that Plaintiff "has been to Cleveland Clinic and seen world experts there and have been to Ann Arbor and seen Dr. Chandler there. These are all neurosurgeons and they have had very little experience with [Plaintiff's] particular type of problem which is extremely rare and there have been very few cases in the whole world of this particular problem." *Id.* Dr. Eilender stated that Plaintiff's lesion is extremely rare and probably no one has ever seen more than one or two of these lesions ever in their whole medical career. (Claim File, p CL—0730).

Dr. Awad of the Cleveland Clinic stated that "[w]hen progressively symptomatic in an eloquent brain location, these lesion are likely to bleed again and would require surgical resection." (Claim File, p CL—1242). However, Dr. Awad stated that "we recommend expectant follow-up versus surgical resection depending on relative risks and benefits." *Id.* Dr. Awad cautioned Plaintiff against excessive strenuous activity, contraindication of anticoagulant therapy and strict avoidance of elective pregnancy. *Id.* Dr. Awad concurred with Plaintiff's choice of expectant therapy in February of 1993 as long as Plaintiff was not worse clinically and the lesion had not rebled.

Based upon the rare nature of Plaintiff's condition, the physicians in this case seem uncertain as to what factors may cause Plaintiff's lesions to rebleed at this time. The doctors at the Mayo Clinic have recommended that Plaintiff undergo a yearly MRI unless her condition worsens which would indicate that more frequent MRIs are needed. Plaintiff's condition is life threatening and as stated by Dr. Abbot, Plaintiff is lucky that she lived through the initial occurrence of bleeding. Although, all the doctors state that Plaintiff's condition should improve over time, none of the

doctors have been able to determine when. Dr. Eilender states that Plaintiff condition has been managed conservatively. What seems to be obvious is that all the physicians agree that Plaintiff is unable to resume her 3000 hours per year job as an account executive with USA Network. Although Defendant states that Plaintiff operates On Course Marketing, Defendant has been unable to show that Plaintiff is working in a position similar to her prior job with USA Networks. Defendant further asserts that Plaintiff works as an Independent Contractor for Southern Michigan Golfer. Defendant has been unable to produce income records to support its assertion but has observed Plaintiff playing golf and engaging in other activities which Defendant alleges contradicts total disability. Defendant has contacted alleged subscribers to the magazine which state they dealt exclusively with Plaintiff.

Defendant has shown that Plaintiff is engaged in at least some of her previous occupational activities. It is uncertain to what extent the activities are comparable to Plaintiff's job responsibilities prior to Plaintiff's bleeding on the brain. At the very least, Plaintiff's disability falls under the definition of disability as defined in number two of the policy. (See Claim File, p CL–0863). There is no evidence that Plaintiff is able to regain all her prior job duties or what portion she may be able to maintain if she regained her duties on a part-time basis..

Defendant also states that Plaintiff is required to provide proof of her disability. Plaintiff provided ample proof of her disability as evidenced by the claim file particularly in 1992—1993. Since the time immediately following the incident, Plaintiff has continued to see doctors less frequently and the MRIs show that Plaintiff's condition is stable. In *Simpson*, the court concluded that the decision to terminate benefits was rational in light of the LTD Plan provision defining an eligible disability as an illness "supported by objective medical documentation" that prevents an employee from "engaging in any occupation or employment" for which the employee is or will become qualified "based on training, education or experience." *Simpson*, 2000 WL 1480893, 2000 U.S. Dist. LEXIS 14607. Nothing in the record supported plaintiff's claim that she suffered from a mental illness that might prevent her from resuming employment. Likewise, the record evidence permitted the Committee to rationally conclude that plaintiff no longer suffered from carpal syndrome in her right hand, any illness in her left hand, or reflex sympathetic dystrophy, at least to the extent such might prevent plaintiff from engaging in any employment for which she was qualified, or would become qualified, based on her training, education or experience.

In contrast, the record in this case has documentation by Plaintiff's physician that Plaintiff is at risk for a rebleed if she returns to her former position. Dr. Abbot agrees that it is possible that stress could trigger a rebleed. In light of the rarity of Plaintiff's condition coupled with the fact that Defendant does not define a disability as one that must be supported with objective findings, Plaintiff has met her burden to show that she is disabled. Pursuant to the policy, Plaintiff was only required to show that she is not able to perform all of the material duties of her occupation. It was not reasonable that Defendant would terminate Plaintiff's benefits and require that she risk her life to prove that stress could cause her another life threatening episode of bleeding.

Accordingly,

IT IS ORDERED that Plaintiff Motion for Entry of Judgment requiring the payment of disability benefits (Docket No. 7, filed March 15, 2001) is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Entry of Judgment (Docket No. 8, filed March 19, 2001) is DENIED.